**AMERICAN FEDERAL BANK, FSB, Plaintiff,**

v.

**UNITED STATES, Defendant.**

No. 95–498C.

United States Court of Federal Claims.

Sept. 1, 2006.

Howard N. Cayne, Arnold & Porter, LLP, Washington, D.C., for plaintiff. With him at trial and on the briefs were David B. Bergman, Michael A. Johnson, and Michael A. Sackey, Arnold & Porter LLP, Washington, D.C.

Jeffrey T. Infelise, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant, with whom were Stuart E. Schiffer, Deputy Assistant Attorney General, David M. Cohen, Director, and Jeanne E. Davidson, Deputy Director, and, at trial as well as on the briefs, Timothy Abraham, Elizabeth Hosford, Tarek Sawi, and Sameer Yerawadekar, Trial Attorneys, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C.

## OPINION AND ORDER

LETTOW, Judge.

This *Winstar*-related case[1] is before the court after a sixteen-day trial on damages that commenced on April 3, 2006 and ended on May 17, 2006. Liability previously was established following a nine-day trial, after which the court found that the government had entered into and breached two contracts with American Federal Bank, FSB ("American Federal"), one consisting of a substituted contract to treat goodwill as regulatory capital and the other to treat subordinated debt as regulatory capital. *See American Fed. Bank, FSB v. United States*, 62 Fed.Cl. 185, 186 (2004) ("*AmFed II*").[2] Thereafter, the court considered cross-motions for summary judgment regarding selected aspects of plaintiff's claims for damages, granting the gov-

ernment's motion respecting plaintiff's claims for lost profits, reliance damages, and certain incidental losses, and otherwise remitting plaintiff's damages claims for trial. *See American Fed. Bank, FSB v. United States*, 68 Fed.Cl. 346, 349 (2005) ("*AmFed III*"). As a result, trial was held to resolve genuine issues of material fact with respect to expectancy damages based upon the cost of replacement capital, four categories of incidental losses, and a tax "gross-up." *Id.* at 348–49. Following post-trial briefing, closing arguments were heard on July 28, 2006. The case is now ready for disposition.

For the reasons stated below, the court concludes that plaintiff is entitled to damages for the government's breach of the two contracts. As explained, further calculations must be made by the parties to derive the specific quantum of damages due. Instructions for those calculations are provided in this opinion for use by the parties in that connection.

## FACTS[3]

Based in Greenville, South Carolina, American Federal was a federally chartered savings and loan association. *AmFed II*, 62 Fed.Cl. at 186. Over the course of a thirty-seven day period in the spring of 1982, American Federal received approval from the Federal Home Loan Bank Board ("FHLBB" or "Bank Board") to acquire four troubled thrifts: (1) United Federal Savings & Loan Association of Fountain Inn, South Carolina, (2) Home Savings & Loan Association of Easley, South Carolina, (3) Family Federal Savings & Loan Association of Greer, South Carolina, and (4) Bell Federal Savings & Loan Association of Inman, South Carolina. *Id.* at 186–87. As part of its agreements with the Bank Board, American Federal was permitted to use the purchase method of accounting to count as regulatory capital the intangible goodwill that was gen-

---

1. *See United States v. Winstar Corp.*, 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996).

2. An earlier decision, *American Fed. Bank, FSB v. United States*, 58 Fed.Cl. 429 (2003) ("*AmFed I*"), had addressed cross-motions for summary judgment on liability.

3. This recitation of facts constitutes the court's principal findings of fact in accord with Rule 52(a) of the Rules of the Court of Federal Claims ("RCFC"). Other findings of fact and rulings on questions of mixed fact and law are set out in the analysis. Additional background facts are set out in *AmFed II*, 62 Fed.Cl. at 186–94, and *AmFed III*, 68 Fed.Cl. at 349–54.

erated as a result of the mergers, and to amortize that goodwill over a forty-year period. *AmFed II*, 62 Fed.Cl. at 187.[4] The four acquisitions that American Federal completed generated $61,158,176 in amortizing supervisory goodwill. *AmFed III*, 68 Fed.Cl. at 349 (citing American Federal's Consolidated Financial Statements (1983 & 1982) at 6–7). Based upon the evidentiary record established by the trial on liability, this court held that agreements were reached between the Bank Board and American Federal respecting treatment of goodwill as regulatory capital, which, in conjunction with actions by the parties, resulted in the creation of implied-in-fact contracts between American Federal and the government. *AmFed II*, 62 Fed.Cl. at 199.

From the time the acquisitions were completed until 1988, American Federal amortized this goodwill according to the schedule agreed upon with the Bank Board. *AmFed II*, 62 Fed.Cl. at 199. By the end of 1988, American Federal could count $50,916,000 in goodwill as regulatory capital. PX 2000 at 29 (Annual Report (1988)).[5] Despite this use of goodwill as regulatory capital, the bank did not satisfy its then-minimum regulatory capital requirements for any year between 1984 through 1988; it also reported a net loss of income from 1984 through 1986. *Id.* at 12.

On September 6, 1988, American Federal sought approval from the Bank Board to execute a modified conversion from a mutual to stock ownership. *AmFed II*, 62 Fed.Cl. at 193.[6] Subsequent to discussions between the Bank Board and American Federal, on November 10, 1988, the Bank Board conditionally approved American Federal's application for a modified stock conversion. *Id.* As part of a negotiated agreement between American Federal and the Bank Board, the overall amortization period for the goodwill arising from the bank's acquisitions in 1982 was shortened from 40 years to 29.5 years. *Id.* Thus, the remaining amortization period for this goodwill became 23.25 years effective October 1, 1988. PX 2000 at 29. This court held that the Bank Board and American Federal entered into a substituted contract to count goodwill as regulatory capital in connection with the government's approval of the modified stock conversion, superseding the four contracts respecting goodwill that the parties had entered into in connection with the approval of the 1982 acquisitions. *AmFed II*, 62 Fed.Cl. at 205.

Concurrently with its conversion application, American Federal sought approval from the Bank Board to include two issues of subordinated debentures totaling approximately $13.6 million as regulatory capital. *AmFed II*, 62 Fed.Cl. at 193. After negotiations, on December 23, 1988, the Bank Board approved this application as well. PX 2003 (Letter from Robert E. Showfety, Principal Supervisory Agent, Bank Board, to William L. Abercrombie, Jr., President and CEO, American Federal (Dec. 23, 1988)). At that time, the government and American Federal entered into a second contract "for recognition of newly issued subordinated debt as regulatory capital." *AmFed II*, 62 Fed.Cl. at 205.

American Federal completed its conversion on January 26, 1989. PX 233 (Annual Report (1989)) at 35. In all, the bank issued three different securities—common stock, Series A subordinated debentures with at-

---

4. In September 1981, the Bank Board issued Memorandum R–31b. *AmFed II*, 62 Fed.Cl. at 187. This memorandum permitted an acquiring thrift to apply the purchase method of accounting for mergers. *Id.* Any excess amount paid by the thrift over the net fair market value of the purchased assets and liabilities assumed was assigned to "goodwill," which was considered as an intangible asset for purposes of regulatory capital. *Id.* (citing 12 C.F.R. § 563.13 (1981)). Under its agreements with the Bank Board, American Federal could count this goodwill toward its regulatory capital requirements, subject to amortization of the goodwill over a forty-year period.

5. Throughout this opinion, plaintiff's exhibits will be denoted by "PX" and defendant's exhibits will be reflected by "DX."

6. A financial institution that is out of capital compliance may not engage in a standard stock conversion, and thus is limited to a modified stock conversion. 12 C.F.R. §§ 563b.3(b)(2), 563b.35 (1988). "In a modified stock conversion, the amount [of money] raised would be in excess of the estimated *pro forma* market value, such that the institution would be viable after conversion." *AmFed II*, 62 Fed.Cl. at 193 n. 13 (citing testimony of J. Larry Fleck).

tendant mandatory purchase contracts, and Series B subordinated debentures with detachable warrants. *Id.* First, two million shares of common stock were sold at a purchase price of $5.00 per share. PX 233 at 35. "From the proceeds [of the sale], $2.0 million was allocated to common stock and $6.3 million, which is net of [c]onversion costs of $1.7 million, was allocated to additional paid-in capital." *Id.* at 35.

Second, for a price of $12.5 million, American Federal sold Series A noninterest-bearing subordinated debentures with a stated aggregate principal amount of $100,000, due January 15, 2004, with attendant nondetachable mandatory purchase contracts ("MPCs"). PX 233 at 35; PX 2017 (Series A Debenture Agreement (Jan. 15, 1989)). The differential between the price of $12.5 million and the principal amount of subordinated debentures of $100,000, resulted in a premium of $12.4 million that was allocated to paid-in capital. PX 233 at 35. The Series A subordinated debentures could be converted into common stock at a conversion ratio that took account of the full price of $12.5 million, but under the MPC agreement, to convert, the debenture holders would be required to provide an additional $12.65 million to purchase common stock at a price of $5.75 per share. PX 2017 at 20. The unusual characteristics of the Series A subordinated debt meant that it in significant measure reflected an option to purchase common stock at a fixed price. All of the Series A issue was purchased by sophisticated institutional investors.[7]

Third, American Federal sold $15.0 million of Series B subordinated debentures, due to mature on January 15, 1999, along with de-

tachable warrants. PX 233 at 33, 35. The warrants were valued in 1989 at $1.361 million, and enabled holders to purchase 600,000 shares of common stock. PX 233 at 33, 35; PX 2016 (Series B Debenture Agreement (Jan. 15, 1989)). The debentures themselves consequently were valued at $13.639 million. PX 233 at 33, 35. All of this issue was also purchased by sophisticated institutional investors, some of whom also were purchasers of the Series A subordinated debentures.[8] The Series B debentures had an interest rate of 11.25%, paid on a semiannual basis. PX 2016 at 11. Series B debenture holders had an option to redeem the debentures beginning January 15, 1996, seven years after the date of the initial sale, based upon a redemption price schedule. *Id.* at 16. Holders were also given until January 15, 1999 to exercise the detachable warrants at an initial purchase price of $5.00 per share, which price could be reduced if certain conditions set out in the debenture agreement were satisfied. *Id.* at 19, 21, B–1.

In total, in January 1989, the bank raised $35,557,242 in capital from the sale of common stock and the Series A and Series B debentures. PX 2096 at 13. Immediately prior to the modified conversion, on December 31, 1988, the bank was required to have a minimum of approximately $31.996 million in regulatory capital, yet the bank possessed only $23.459 million in regulatory capital, a shortfall of $8.537 million. PX 2000 at 39. After the conversion in January 1989, however, American Federal's regulatory capital increased to approximately $59.1 million, approximately $27.1 million greater than the

---

7. An investment banking house, Keefe, Bruyette & Woods, Inc. ("Keefe Bruyette"), purchased Series A debentures with a stated principal amount of $24,000. Travelers Insurance Company purchased $32,000, General Electric Pension Trust purchased $26,000, Bessemer Venture Partners purchased $16,000, and Liberty Life Insurance purchased the remaining $2,000 of the principal amount. *Id.* at Schedule A; PX 2096 (Office of Thrift Supervision Report of Examination (May 30, 1989)) at 15. Given the stated value of the Series A subordinated debt entries ($100,000) and the actual purchase price ($12,-500,000), the Series A subordinated debentures cost Keefe Bruyette $3,000,000, Travelers Insurance Company $4,000,000, General Electric Pension Trust $3,250,000, Bessemer Venture Part-

ners $2,000,000, and Liberty Life Insurance $250,000. PX 2017 at Schedule A.

8. Eight institutional parties purchased Series B debentures and warrants: The Citizens and Southern Corporation purchased $4 million of Series B debentures and warrants, Peoples Heritage Savings Bank purchased $500,000, First Colony Life Insurance Company purchased $1.25 million, The One Bancorp purchased $1 million, Liberty Life Insurance purchased $1.5 million, Keefe Bruyette purchased $500,000, Travelers Insurance Company purchased $1 million and General Electric Pension Trust purchased $5.25 million. PX 2016 at Annex I; PX 2096 at 15.

minimum requirements. PX 233 at 37. At the end of 1989, the bank's balance sheet included $48.702 million in supervisory goodwill and $13.739 million in subordinated debt that would have counted as regulatory capital, but for a change in the government's posture toward goodwill. PX 233 at 33, 37.

On August 9, 1989, the government enacted the Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA"), Pub.L. No. 101–73, 103 Stat. 183 (codified in scattered sections of Title 12 of the U.S.Code, including 12 U.S.C. § 1464). FIRREA eliminated the use of goodwill as regulatory capital and limited the use of subordinated debt as core capital. On October 27, 1989, the Office of Thrift Supervision ("OTS"), the successor to the Bank Board under FIRREA, announced regulations implementing the new capital requirements of FIRREA, to be effective December 7, 1989. 54 Fed.Reg. 46,845 (Nov. 8, 1989) (codified at 12 C.F.R. pts. 561, 563 and 567). The passage of FIRREA and adoption of implementing regulations breached both of the contracts between the government and American Federal respecting regulatory capital: namely (1) the substituted contract that concerned the treatment of goodwill as regulatory capital with an attendant amortization period, and (2) the newly-formed contract that permitted American Federal to consider the Series A and B subordinated debt as regulatory capital. *AmFed II*, 62 Fed.Cl. at 205.

Following the implementation of FIRREA's new standards by OTS, American Federal was not in capital compliance. PX 2118 (Capital Plan 1990–1994 (Jan. 8, 1990)) § 1. At the end of 1989, under the new regulations, the bank needed $15.987 million in tangible capital, $31.974 million in core capital, and $49.788 million in risk-based capital. PX 233 at 37.[9] The bank was deficient with respect to all of these requirements: the bank then had *negative* tangible capital of $12.849 million, core capital of only $3.138 million, and risk-based capital of $6.276 million. *Id.* at 37. Thus, the bank failed both its tangible capital and core capital requirements each by $28.836 million, and the bank failed its risk-based capital requirement by $43.512 million. *Id.*

OTS issued guidelines and procedures for the manner in which an institution that failed the capital requirements under FIRREA would be regulated or addressed by the government. PX 2093 (OTS, Thrift Bull. No. 36, Guidelines for FIRREA Capital Plans, Exemptions and Exceptions (Nov. 6, 1989)). If not seized or closed, such an institution was required to submit a capital plan that would "explain in detail the proposed strategies for raising capital and for accomplishing the overall objectives of the savings association." *Id.* at 2. Moreover, the institution would be required to meet or exceed all applicable standards under FIRREA no later than December 31, 1994. *Id.*

American Federal submitted its capital plan to OTS on January 8, 1990. PX 2118.[10] In its capital plan, American Federal described how the bank would satisfy its capital requirements by the required deadline of December 31, 1994, in two general phases. *Id.* First, American Federal would seek a purchaser for all of the bank's stock at a "fair price for that stock." PX 2118 at 1. If the bank were unable to find such a party by the end of 1990, the second phase would be triggered, which strategy encompassed a number of actions. *Id.* "The principle components of [phase two of] the capital plan include[d] retention of future earnings, reduction of non-qualifying assets and securitization of mortgage loans into mortgage-backed securities." PX 2109 (1990 Annual Report) at 42. Thus, "[m]ortgage banking and secondary marketing activities [we]re an integral part of the capital plan." PX 2118 at 4.2. In addition, the holders of the Series B subordinated debentures would convert those debentures into non-cumula-

---

9. At the end of 1989, the then-effective (not fully phased in) capital requirements were tangible capital of not less than 1.5% of total assets, core capital of not less than 3% of total assets, and risk-based capital not materially different from that of national banks. PX 233 at 37.

10. The capital plan was subsequently twice amended in limited respects. PX 2143 (Capital Plan First Amendment (Mar. 8, 1990)); PX 2190 (Capital Plan Second Amendment (May 18, 1990)).

tive, perpetual preferred Series I stock ("Series I preferred stock"). PX 2118 at 1. Finally, the bank did not include in its capital plan "any application for a significant transaction, such as a merger, acquisition or branch purchase." *Id.* at AF36 00658 (Introduction to Capital Plan); *see* Stip. ¶ 10. The bank informed OTS that it had selected the elements of this plan because other options that had been considered would have "effectively eliminated the Bank's earnings stream and demonstrated a progressive decline in capital adequacy" despite the fact that "the projected impact of these [other] concepts attained a higher level of capital adequacy sooner." PX 2118 at 2.2.[11]

Initially, NCNB Corporation and The Citizens and Southern Corporation expressed an interest in acquiring American Federal. PX 2118 Exhibits ("Exs.") 1 (Letter from Frank L. Gentry, Senior Vice President, NCNB Corporation, to James C. Mabry, Senior Vice President, Keefe (Sept. 8, 1989)), 2 (Letter from Hugh M. Chapman, President, The Citizens and Southern Corporation, to C. Edward McConnell, Executive Vice President, Keefe Bruyette (Sept. 15, 1989)). Both offers, however, were rejected by American Federal's Board of Directors because the "prices and conditions ... appeared to be substantially below market value." PX 2118 at 2.1.

Thereafter, the bank's management entered into negotiations with the holders of the Series B subordinated debentures to exchange those debentures for Series I preferred stock. Tr. 169:6 to 172:25 (Test. of Trimble); PX 2118 at 2.1.[12] On April 17, 1990, the debenture holders exchanged their debentures for 15,000 shares of non-voting, non-cumulative Series I preferred stock, with each share nominally valued at $1,000. PX 2109 at 24, 38; *see* PX 2146 (Conversion Agreement (Mar. 14, 1990)).[13] The Series I preferred was an unusual security that allowed for payment of no dividends for a time, but accorded holders a strong priority of payment should the bank be sold, merged, or begin to pay dividends on its common stock. The Series I preferred had priority over the common stock in payment of dividends, priority in payment of proceeds in the event of a liquidation of the bank, and priority in the allocation of proceeds in the event of a business contribution involving the bank. PX 2109 at 38. The non-cumulative dividend on the Series I preferred was at a rate equal to the interest that was payable on the Series B subordinated debt, adjusted for the tax consequences to the bank of the obligation to pay preferred dividends as contrasted to interest. PX 2165 (Supplementary Charter Section ... For Noncumulative Perpetual Preferred Stock, Series I (Apr. 13, 1990)) at 2.[14] The dividend priority over common stock was absolute.[15] In the event of a business

---

**11.** Options that American Federal considered but rejected included "disposing of as many as 16 branches with $263 million in deposits and eliminating all the costs associated with their operation; selling the commercial loan, nonresidential real estate and lease financing portfolios and eliminating all the costs associated with them; selling all assets currently owned at a price below market value; immediately securitizing as much of [its] mortgage loan portfolio as possible to reduce risk-based assets, and sale/leaseback of branch facilities." PX 2118 at 2.2.

**12.** The bank, which due to its capital-deficient regulatory condition was limited in terms of its activity, had initially sought an exception to permit payment of dividends on the Series I preferred stock as an inducement to the holders of the Series B debentures to exchange. PX 2118 at 5.5. Ultimately, American Federal withdrew its request for such an exception. PX 2143 at 1–2.

**13.** The detachable warrants were unaffected by the exchange of Series B subordinated deben-

tures for Series I preferred stock. PX 2109 at 38.

**14.** American Federal's interest payments on the Series B subordinated debt were deductible from income for tax purposes; dividend payments were not. The quarterly dividend rate on the Series I preferred was the dollar amount that corresponded "to the difference between (x) 2.8125% and (y) the product of (I) 2.8125% and (II) the federal income tax rate paid by the Bank for the fiscal year immediately preceding the fiscal year in which the dividend is declared." PX 2165 at 2.

**15.** The charter for the Series I preferred provided that "[s]o long as any shares of Series I [preferred] shall remain outstanding, no dividend whatsoever shall be declared or paid upon or set apart for the [c]ommon [s]tock or any other stock ranking junior to Series I [preferred] in payment of dividends." PX 2165 at 2.

combination, the Series I holders had a right to be paid, as a priority over any payments to holders of common stock or Series A subordinated debt, an amount "that w[ould] provide during the [h]olding [p]eriod [of the Series I preferred] an annual pre-tax compound rate of return of 11.25% ... less the amount of any cash dividends paid on the Series I [preferred] during the [h]olding [p]eriod." PX 2165 at 4.

With the Series I preferred in place, on May 31, 1990, OTS approved American Federal's capital plan. DX 286D (Federal Deposit Insurance Corporation ("FDIC") Report of Examination (Dec. 10, 1990)) at 1.

In accord with its capital plan, American Federal began to convert residential mortgage loans into mortgage-backed securities. PX 2506 (Offering Circular Amendment Two (Mar. 12, 1993)) at 34. The purpose of this conversion was to reduce the bank's risk-based capital requirements. *Id.* at 34–35. Over a three-year period, American Federal securitized $47.918 million, $55.634 million, and $48.891 million of mortgage loans in 1990, 1991, and 1992, respectively. *Id.* at 35.

From 1990 to 1993, American Federal's capital position consistently improved. By September 30, 1992, the bank satisfied all of its then-applicable (but not fully phased in) minimum regulatory capital requirements. DX 520D (OTS Report of Examination (Nov. 16, 1992)) at 1–2, 14; PX 2430 (Form 10–Q (Sept. 30, 1992)) at 18–19; *see* 12 C.F.R. §§ 567.2(a), 567.8, 567.9 (1992). Ultimately, by the end of 1992, the bank had increased its tangible equity by $46.9 million since the advent of FIRREA, of which "$32.7 million [wa]s attributable to retained earnings and amortization of goodwill and approximately $13.6 million [wa] s attributable to the conversion [of the Series B debentures to Series I preferred stock]." PX 2455 (Form 10–K (Dec. 31, 1992)) at 3. Thus, over the three-year period from the date of the government's breach of its two contracts with the bank through 1992, American Federal's "regulatory tangible capital position [improved]

from a negative $12.8 million ... to a positive $34.0 million." *Id.* Nevertheless, the bank acknowledged that the minimum capital requirements were projected to increase on January 1, 1993, and, in addition, that on December 31, 1994, the bank would lose the ability to count as capital the portion of the supervisory goodwill that remained qualified under a phase-out schedule specified in FIRREA. PX 2430 at 23. Consequently, American Federal cautioned that "no assurance can be given that the Bank will meet the higher requirements [after] December 31, 1992." *Id.*

On March 18, 1993, American Federal completed both a secondary stock offering and an exchange of previously-issued securities for common stock. PX 2457 (1993 Annual Report) at 40. Respecting the latter, the holders of Series A subordinated debentures and the holders of Series I preferred stock both exchanged their securities for common stock, and some of those holders offered their resulting common stock for sale in the secondary offering. *Id.*; PX 2466 (Offering Circular (Jan. 11, 1993)) at 85 (table showing exchange, resulting common stock to be received and then partially sold by the institutional holders of the Series A debentures and the Series I preferred, and shares retained by the institutional holders after the offering). Specifically, the Series A holders converted their subordinated debentures into 2,173,912 shares of common stock, and, as required by the MPCs, concurrently purchased an additional 2,195,650 shares of common stock for $12.625 million. PX 2457 at 40; *see AmFed III*, 68 Fed.Cl. at 352 n. 6 (explaining the correct number of common stock shares into which Series A debentures were converted). Simultaneously, the Series I preferred stockholders received 2,340,768 shares of common stock for their 15,000 preferred shares. PX 2457 at 23, 40.[16] Of the common shares received by the Series I preferred holders, 1,714,286 common shares were attributable to the paid-in preferred shares themselves,[17] and 626,482 of common shares were attributable to the compounded

---

16. The 600,000 detachable warrants were not affected by this conversion. PX 2457 at 40.

17. The face amount of $15,000,000 for the Series I preferred stock was exchanged for common stock at $8.75 per share of the common. PX 2457 at 40.

dividend entitlement that the Series I preferred holders had not received.[18] Some of the Series I preferred holders also sold the common stock they received. PX 2466 at 85. In addition, American Federal sold 2,083,955 shares of common stock. PX 2457 at 40. As a result, a total of 6.21 million shares of common stock were sold: (1) 2,083,955 by American Federal and (2) 4,126,045 by the former holders of Series A and Series I instruments. PX 2457 at 40. The 6.21 million shares were sold in the public offering at a price of $8.75 per share. *Id.*[19]

From the new common stock that the bank itself sold in the offering, the bank obtained $16.6 million in net proceeds, "of which $2.1 million was allocated to common stock and the balance was allocated to additional paid-in capital." PX 2457 at 40. In total, the bank raised $29.4 million in net proceeds from the exercise of MPCs, the exchange, and the secondary offering, *id.* at 17, 22, and incurred $1.61 million in transaction costs. Stip. ¶ 32.

Shortly thereafter, OTS released American Federal from its capital plan and all attendant conditions. PX 2532 (Form 10–Q (Mar. 31, 1993)) at 19. By the end of 1993, American Federal recorded a tangible capital ratio of 7.35%, a core capital ratio of 7.35% and a risk-based capital ratio of 14.17%. PX 2457 at 17. Consequently, the bank satisfied all the regulatory capital requirements under FIR-REA, exceeding all three capital ratios by the end of 1993. *Id.* In addition, American Federal was classified as a "well-capitalized" financial institution "on a current and a fully phased-in basis under the prompt corrective action provision of the Federal Deposit Insurance Corporation Improvement Act of 1991," Pub.L. No. 102–242, 105 Stat. 2236 (1991) (codified at 12 U.S.C. §§ 1811–34b) ("FDICIA").[20] PX 2457 at 18. Based on the capital ratios of FDICIA, at the end of 1993, the bank exceeded the "well-capitalized" standards, *i.e.*, a 5.00% minimum leverage ratio, a 6.00% Tier I risk-based capital ratio, and a 10.00% total risk-based capital ratio, by 2.35%, 6.92% and 4.17%, respectively. *Id.*; *see* 12 C.F.R. § 565.4(b)(1) (1993).

After the secondary offering and exchange, American Federal, on December 3, 1993, adopted the method of accounting with respect to goodwill preferred by Accounting for Certain Acquisitions of Banking or Thrift Institutions, Statement of Financial Accounting Standards No. 72 ("FASB 72"), effective January 1, 1993. PX 2457 at 18; PX 2573 (Form 8–K (Dec. 15, 1993)).[21] The use of

---

**18.** The computed dividend entitlement on the Series I preferred was $5,481,918, and was also exchanged for common stock at $8.75 per share of the common. PX 2457 at 40; PX 2466 at 85 (calculations from the data provided). *See also* Tr. 2025:2–6 (Test. of Professor Anjan Thakor, an expert who testified on behalf of the government).

**19.** Respecting the public offering of the bank's newly-issued shares, American Federal paid the underwriters $0.51 per share. PX 2511 (Pricing Agreement (Mar. 12, 1993)). Consequently, American Federal sold its 2,083,955 shares to the underwriters for $8.24 per share. *Id.*; PX 2457; *see also* Tr. 349:10 to 350: 10 (Test. of Trimble).

**20.** Section 131 of FDICIA added Section 38 to the Federal Deposit Insurance Act, entitled "Prompt Corrective Action," establishing five new capital categories for insured depository institutions: "well capitalized," "adequately capitalized," "undercapitalized," "significantly undercapitalized," and "critically undercapitalized." § 131, 105 Stat. at 2253 (codified at 12 U.S.C. § 1831*o*). On September 29, 1992, final rules implementing that Section were adopted by the Board of Governors of the Federal Reserve System, the Office of the Comptroller of the Currency, the Federal Deposit Insurance Corporation ("FDIC"), and OTS. 57 Fed.Reg. 44,866–901 (Sept. 29, 1992) (codified in part at 12 C.F.R. §§ 208.33 (Federal Reserve Board), 325.103 (FDIC) and 565.4(OTS) (1993)). The final rules became effective December 19, 1992, which was also the effective date of Section 131 of FDICIA. The regulations defined the five capital categories in terms of minimum capital ratios. *See, e.g.*, 12 C.F.R. § 565.4(b) (1993).

**21.** Prior to FASB 72, "thrifts were allowed to accrete the discount resulting from the mark-to-market over the average life of the loans and at the same time amortize the goodwill over a longer period. A thrift would thereby show a 'gain' in the earlier years following a supervisory merger." *Long Island Sav. Bank, FSB v. United States*, 60 Fed.Cl. 80, 84 n. 6 (2004) (citing *Winstar*, 518 U.S. at 852–55, 116 S.Ct. 2432). FASB 72 "eliminated any doubt that the differential amortization periods on which acquiring thrifts relied to produce paper profits in supervisory mergers were inconsistent with [generally accepted accounting principles]." *Winstar*, 518 U.S. at 855, 116 S.Ct. 2432.

this preferred accounting method resulted in the bank's writing off the remaining $36.2 million in goodwill as of January 1, 1993. PX 2457 at 18.[22] "The Bank anticipate[d] no additional goodwill amortization expense in subsequent years related to the 1982 acquisitions." *Id.* "In addition during 1993, the Bank reduced [g]oodwill by $3.7 million for tax credits relating to the 1982 acquisitions." *Id.* at 27.

On August 16, 1993, American Federal distributed its first quarterly cash dividend on its common stock at $0.05 per share, paid quarterly, a planned annual rate of $0.20 per share. PX 2551 (Minutes of Board of Directors Meeting (July 15, 1993)) at 1861–62. Thereafter, beginning on November 7, 1994, the bank increased cash dividends to $0.07 per share on a quarterly basis, which payment equaled a 20% payout ratio to earnings. PX 2699 (Minutes of Board of Directors Meeting (Oct. 20, 1994)) at 1986–87. The bank continued to pay cash dividends at a rate of $0.07 per share each quarter until May 10, 1996, when the bank increased the quarterly dividend rate to $0.10 per share, which payment equaled a 25% payout ratio to earnings. PX 2852 (Minutes of Board of Directors Meeting (Mar. 21, 1996)) at 2106–07. The following year, the bank increased quarterly cash dividends to $0.12 per share, beginning on February 10, 1997, increasing the payout ratio to approximately 27% to earnings. PX 2914 (Minutes of Board of Directors Meeting (Jan. 16, 1997)) at 2176–77.[23]

On February 18, 1997, American Federal reached a merger agreement with CCB Financial Corporation, of Durham, North Carolina ("CCB"). PX 2827 at 37. Under the agreement, structured as a pooling of interests, CCB would issue 0.445 shares of common stock for each full share of American Federal. PX 2827.[24] The transaction was "valued at $325.1 million based on the exchange ratio and the five-day average closing price of CCB through Friday, February 14, 1997." *Id.* at 14. Ultimately, the transaction was completed on August 1, 1997 and was valued at $410.3 million based on the closing price of CCB's common stock on July 31, 1997. PX 3053 (CCB Press Release (Aug. 1, 1997)). After the transaction was completed, American Federal operated under its own name as a wholly-owned subsidiary of CCB. *Id.*[25] On June 17, 2000, American Federal merged into Central Carolina Bank & Trust Company ("CCB & T"), a wholly-owned subsidiary of CCB. Stip. ¶¶ 42–43. Less than one month later, on July 5, 2000, CCB merged with National Commerce Bancorporation ("NCBC"), and thus CCB & T became a wholly-owned subsidiary of NCBC. *Id.* ¶ 43. The following year, on or about April 25, 2001, NCBC changed its name to National Commerce Finance Corporation ("NCFC"). *Id.* ¶ 44. On December 31, 2001, CCB & T merged into National Bank of Commerce, a wholly-owned subsidiary of NCFC. *Id.* ¶ 45. Thereafter, on October 1, 2004, NCFC merged into SunTrust Banks, Inc. *Id.* ¶ 47. National Bank of Commerce remained a wholly-owned subsidiary of SunTrust Banks,

---

**22.** "Absent the write-off, American Federal would have been permitted to treat $8,346,000 of its goodwill as Qualifying Supervisory Goodwill as of December 31, 1993." Stip. ¶ 39.

**23.** In 1995, the bank repurchased 40,000 detachable warrants, originally sold with the Series B subordinated debentures in 1989, at $10.00 per warrant, and 20,000 warrants at $9.50 per warrant. PX 2715 (Annual Report (1995)) at 37. It continued to repurchase warrants and by July 18, 1996, the bank had repurchased all 540,000 warrants that remained outstanding for approximately $5.681 million. PX 2827 (Annual Report (1996)) at 18, 34.

**24.** To account for CCB's dividend schedule and the anticipated closing of the merger, American Federal scheduled the timing of payments of its dividends to accommodate that of CCB, and de-

clared the third dividend for 1997 earlier than otherwise scheduled, at $0.12 per share, for July 1, 1997. PX 3011 (Minutes of Board of Directors Meeting (May 15, 1997)) at AF08 01139.

**25.** Beginning on October 1, 1997, American Federal paid CCB a $2.3 million quarterly dividend; CCB declared a $0.47 per share quarterly cash dividend. *See, e.g.,* PX 3045 (Minutes of Board of Directors Meeting (July 31, 1997)) at 2216. In addition, during 1998 and 1999 American Federal paid CCB $32 million in special dividends to aid CCB in its stock repurchase program. PX 3111 (Minutes of Board of Directors Meeting (Oct. 20, 1998)) at AF08 02185; PX 3148 (Minutes of Board of Directors Meeting (Oct. 21, 1999)) at AF68 00330.

Inc. until April 22, 2005, when that bank merged into SunTrust Bank, itself a wholly-owned subsidiary of SunTrust Banks, Inc. *Id.* ¶¶ 48–49.

## ANALYSIS

 Compensation to the injured party by way of money damages is the primary means of remedying a breach of contract. 24 Samuel Williston & Richard A. Lord, *A Treatise on the Law of Contracts* § 64:1 ("*Williston*") at 4–5 (4th ed.2002). Expectancy damages, the amount that represents the benefit to which the non-breaching party was entitled had performance been rendered, generally provides the basis for an award of contractual damages. *LaSalle Talman Bank F.S.B. v. United States*, 317 F.3d 1363, 1371 (Fed.Cir.2003); *Restatement (Second) of Contracts* § 344(a) (1981); *Williston* § 64:2 at 30; *see Glendale Fed. Bank, FSB v. United States*, 239 F.3d 1374, 1380 (Fed.Cir.2001). "A plaintiff is entitled to an award of expectancy damages upon showing by a preponderance of the evidence that such damages were proximately caused by the breach, that they were actually foreseen or reasonably foreseeable, and that the amount can be estimated with reasonable certainty." *Long Island Savs. Bank, FSB v. United States*, 67 Fed.Cl. 616, 638 (2005) (citing *La Van v. United States*, 382 F.3d 1340, 1351 (Fed.Cir. 2004)).

 Expectancy damages generally are equated with profits lost, but may include other losses incurred by the breach of contract, including incidental losses. *See Glendale*, 239 F.3d at 1380 (citing *Restatement (Second) of Contracts* § 347). "Incidental losses include costs incurred in a reasonable effort, whether successful or not, to avoid loss." *Restatement (Second) of Contracts* § 347 cmt. c; *see also Williston* § 66:55–56 at 664–77.

### A. Mitigation through Replacement Capital

As this court has previously stated, "[o]n its facts, this case is similar to other *Winstar* cases in which, after the government's breach of contract, the bank mitigated its

losses and survived." *AmFed III*, 68 Fed.Cl. at 355 (citing *LaSalle*, 317 F.3d 1363; *Home Sav. of Am. v. United States*, 399 F.3d 1341 (Fed.Cir.2005) ("*Home Savings II*"); *Long Island*, 67 Fed.Cl. 616). The mitigation occurred through raising new, tangible capital to replace the regulatory capital that was lost in the breach. Courts in these comparable cases have held generally that " 'the cost of replacement capital can serve as a valid theory for measuring expectancy damages in the *Winstar* context because it provides a measure of compensation based on the cost of substituting real capital for the intangible capital held by plaintiff in the form of supervisory goodwill.' " *LaSalle*, 317 F.3d at 1374 (quoting the trial court's decision); *accord Home Sav. II*, 399 F.3d at 1353–55; *see Long Island*, 67 Fed.Cl. at 638–48. In this respect, in its assessment and calculation of damages, the court is bound by the Federal Circuit's decisions in *LaSalle* and *Home Savings II* and is guided by this court's decision in *Long Island*.

Conceptually, American Federal argues that it engaged in five sets of actions to mitigate the damages arising from the government's breach. American Federal contends that each of these five mitigating steps should factor into the calculation of damages because the actions were caused by the breach, were foreseeable, were reasonable steps in mitigation, and lead to a calculation of damages to a reasonable certainty. *See* Plaintiff's Opening Post–Trial Brief ("Pl.'s Post–Trial Br.") at 23–50. The five events were: (1) the 1990 exchange of Series B subordinated debentures for Series I preferred stock, (2) the 1993 conversion of Series A subordinated debentures into common stock and the exercise of MPCs for common stock, (3) the 1993 exchange of Series I preferred stock for common stock, with issuance of additional common stock to provide compensatory payment for dividends in arrears, (4) the 1993 secondary offering of newly-issued common stock, and (5) the 1997 merger with CCB and subsequent business combinations culminating in the merger with SunTrust Bank. *See* Pl.'s Post–Trial Br. at 7–12, 35.[26] The court will address each of these actions in its analysis.

---

**26.** At no time has plaintiff put forward a claim of damages with respect to retained earnings. Dur-

## 1. *Causation.*

■ The Federal Circuit in *LaSalle* stated that "precedent distinguishes between remote consequences of contract breach, whether favorable or unfavorable to the non-breaching party, and those that are directly related to or direct consequences of the breach.... [R]eduction of loss through a substitute transaction is generally a direct mitigation of damages." 317 F.3d at 1373. Provided that a causal connection can be "definitely established" between the breach of contract and events that subsequently occur, *California Fed. Bank v. United States,* 395 F.3d 1263, 1268 (Fed.Cir.2005), the harm to the injured party from such consequences must be recoverable as damages in mitigation, while obversely, the benefits of the direct consequences of the breach must be credited against a recovery. *See LaSalle,* 317 F.3d at 1373.

Upon the enactment and implementation of FIRREA, American Federal immediately failed all of the applicable minimum capital requirements. PX 2118 § 1. The terms of FIRREA completely elided the $27.1 million capital "cushion" that the bank had held subsequent to its modified stock conversion and before FIRREA. *See* PX 233 at 37. Notably, the bank's tangible capital after FIRREA was a *negative* $12.849 million. *Id.* The breach forced the bank to suspend its plans for growth and expansion. *See* Tr. 128:15 to 130:1 (Test. of Trimble) (stating that before FIRREA, the bank had not intended to issue dividends "in the foreseeable future" such that it might retain earnings to build capital as a base "to expand in a variety of ways"). Post–FIRREA, the bank could not increase its assets beyond interest credited on deposits, could not pay dividends of any kind, and was required to file a capital plan to demonstrate how it would raise additional capital and ultimately be in capital compliance by December 31, 1994. PX 2093 at 2.

The bank engaged in a variety of activities to mitigate the loss in regulatory capital it incurred as a result of the government's breach. First, on April 17, 1990, following negotiations between the holders of the Series B subordinated debentures and the bank, the Series B holders exchanged their debentures for 15,000 shares of Series I preferred stock. PX 2109 at 24, 38. Following the exchange, the Series I preferred stock qualified as tangible capital under FIRREA. PX 2146 at 1. Only after that exchange, on May 31, 1990, did OTS approve the bank's capital plan. PX 2532 (American Federal Form 10–Q (Mar. 31, 1993)) at 25. The exchange of the Series B subordinated debentures into Series I preferred was dictated by the bank regulators as a condition for approving the bank's capital plan. *See* PX 2148 (Minutes of Board of Directors Meeting (March 15, 1990)) at 1555 (regulators at OTS–Atlanta "advised that the capital plan would not receive any consideration until the Series B conversion was completed or at least agreed to in principle"). American Federal's management did not favor that exchange because "[i]t was dilutive to common shareholders ... [and] to other participants that had put their money in in good faith." Tr. 205:5–7 (Test. of Trimble). Nonetheless, it was something American Federal considered that it "had to [do], as soon as [it] could, [to] get [it]sel[f] out from under." Tr. 205:23–25 (Test. of Trimble).[27] In addition to the exchange, under the capital plan, the bank mitigated the breach by retaining earnings and by securitizing, and thereafter selling, residential mortgage loans. PX 2118 at 4.2.

---

ing trial, the court ruled, in response to arguments raised by defendant in connection with its Memorandum Concerning the Legal Standards Governing the Scope of a Rebuttal Case, filed April 14, 2006, that plaintiff had failed to put forward any claim for damages based on earnings retained from 1990 to 1993. Tr. 2603:16–21, 2605:1–5. *See* Tr. 1257:1–7, 14–17, 1257:24 to 1258:2 (Test. of John R. Jay, plaintiff's expert witness) ("I have not done any specific analysis to determine any costs [or derived benefits] associated with retained earnings."), 1619:10–13 (Jay testifying that he was "not instructed to determine any cost associated with retained earnings").

**27.** Although initial negotiations with the holders of the Series B debentures failed to achieve an exchange agreement, *see* Tr. 171:1–20 (Test. of Trimble), American Federal eventually offered sufficiently favorable terms to these holders to reach such agreement. Tr. 172:5–25 (Test. of Trimble).

Beginning in March 1992, American Federal began to consider further steps to mitigate the losses incurred from the government's breach through recapitalization and a reorganization of the bank's capital structure. *See* DX 464D (Letter from John G. Duffy, Keefe Bruyette, to Trimble (Mar. 17, 1992)); PX 2441 (Minutes of Board of Directors Meeting (Nov. 19, 1992)) at 1787 (authorizing secondary offering); PX 2450 (Minutes of Board of Directors Meeting (Dec. 17, 1992)) at 1797 (confirming that "the preferred stock and the Series A debenture holders ... indicated their interest in a common stock exchange in the recapitalization program").

Detailed presentations were made by the bank's financial advisors and by the bank's management to the institutional investors that held the bank's Series A subordinated debentures and Series I preferred stock, and negotiations with those investors were undertaken. Tr. 233:19 to 234:1 (Test. of Trimble) ("[W]e[, Roy Abercrombie and I,] had to in effect convince the preferred shareholders to come to the table and get out of the way so to speak and do a conversion that wasn't mandated under the agreement. We had to ... find out exactly what the [S]eries A holders were planning to do, and get them to agree to put forth their money, the $12.625 million in order to do a conversion."). Ultimately, a secondary offering and exchange was undertaken and completed in March 1993. First, the holders of the Series A subordinated debentures converted those debentures into 2,173,912 shares of common stock. PX 2457 at 40. Concurrently, pursuant to the MPC agreement, these holders purchased 2,195,650 shares of common stock for $12.625 million. *Id.* Second, the Series I preferred stockholders exchanged their 15,-000 shares for 1,714,286 shares of common stock, and additionally received 626,482 shares of common stock in lieu of the dividend entitlement that had not been paid on that stock. *Id.* Third, the bank offered for sale 1,273,955 shares of common stock to be newly-issued, and the former Series A and Series I holders offered to sell 4,126,045 shares of common stock they were receiving in the conversion and exchange of their securities. PX 2506 at 4. The secondary offering of the bank's shares was over-subscribed,

and a further 810,000 shares were sold to and by the underwriters pursuant to their option to purchase and sell additional shares to cover any over-allotment, *i.e.*, a "green shoe." PX 2506 at 1. In total, the bank raised approximately $29.4 million in new capital from the offering and exchange. PX 2457 at 22, 40.

After the 1993 offering and exchange, American Federal satisfied all of the fully phased-in requirements under FIRREA and was classified as a "well-capitalized" institution under FDICIA. *See supra*, at 595. Moreover, OTS released the bank from its capital plan and removed the attendant restrictions on its operations. PX 2532 at 25.

American Federal argues that its final mitigating step was the merger with CCB in 1997 and that "but for the breach, CCB's acquisition of American Federal would not have happened." Pl.'s Post–Trial Br. at 35. The merger with CCB was eventually consummated on August 1, 1997. PX 3053.

The government contests all but the first mitigating step taken by American Federal. It accepts the first step—that the Series B subordinated debentures had to be exchanged for the Series I preferred, Tr. 3353:5–8 (defendant's closing argument) (agreeing that the breach was the cause of the exchange of the Series B subordinated debentures for Series I preferred stock)—but the government contests each aspect of the secondary offering and exchange and the 1997 merger with CCB as being either unreasonable and unnecessary steps for mitigation or remote from the breach, or both. *See* Def.'s Post–Trial Br. at 23–27 (contending that the secondary offering and exchange was unreasonable and unnecessary); Defendant's Post–Trial Reply Brief ("Def.'s Post–Trial Reply") at 11–16 (arguing that all events after August 1997 were remote).

Respecting the 1993 offering and exchange, the government avers that the bank never "historically maintained a 'target' capital level, or a capital 'cushion,' that the enactment of FIRREA eliminated." Def.'s Post–Trial Br. at 23. From this premise, the government argues that the 1993 offering and exchange was never intended to allow

American Federal to "re-establish a historical 'target' capital level." *Id.* Alternatively, and as a lesser included argument, the government argues that the breach did not specifically cause the bank to sell approximately 2.08 million new shares in 1993 because the capital raised from the other aspects of the 1993 offering and exchange was sufficient to satisfy all of FIRREA's phased-in capital requirements and for the bank to be categorized as "well-capitalized" under FDICIA. *Id.* at 25–27.

As in prior *Winstar*-cases before this court and the Federal Circuit, although the government puts these arguments forward under the guise of causation, *id.* at 27 ("the costs associated with the 1993 Offering and Exchange were not *caused* by the enactment of FIRREA" (emphasis added)), they are more properly regarded as contentions about the reasonableness of the steps that plaintiff took in mitigating the breach. *See First Heights Bank, FSB v. United States*, 422 F.3d 1311, 1317 (Fed.Cir.2005); *Long Island*, 67 Fed.Cl. at 640. "The clear import of the government['s] characterizing its argument[s] as one[s] of causation is to avoid the reasonability element of the mitigation doctrine," because plaintiff has the burden to prove that its actions were caused by the breach, while the government has the burden to prove the unreasonableness of the actions taken. *First Heights Bank*, 422 F.3d at 1317; *see Long Island*, 67 Fed.Cl. at 640 (citing *Globe Sav. Bank, F.S.B. v. United States*, 65 Fed.Cl. 330, 348 (2005), *aff'd in part and remanded in part on another ground*, 189 Fed.Appx. 964, 2006 WL 2045776 (Fed.Cir. July 20, 2006)).

The government elaborates on its primary contention by averring that prior to FIRREA, American Federal had annually failed its capital requirements and, unlike the plaintiff-thrift in *Home Savings*, never routinely maintained an amount of capital in excess of the regulatory minimum. Def.'s Post–Trial Br. 23–24 (discussing *Home Sav. of Am., F.S.B. v. United States*, 57 Fed.Cl. 694, 697 (2003) ("*Home Sav. I* ")). However, in actuality, contrary to the government's contention, prior to FIRREA the bank had started to develop a capital cushion beginning with the modified stock conversion in January 1989. *Compare* PX 2022 (Offering Circular (Jan. 19, 1989)) at iii (informing potential stockholders that the purpose of the conversion was to "significantly increase American Federal's capital position and enable it to *exceed* its current minimum regulatory capital requirement" (emphasis added)), *with* DX 2103A (Minutes of American Federal's Executive Committee (July 6, 1989)) at 2 (outlining the courses of action that American Federal could pursue in light of FIRREA's "new tangible capital criteria" that would cause the bank to fall out of "line with its previous development goals"). Furthermore, the record at trial shows definitively that American Federal converted to stock ownership in 1989 specifically to raise capital both "to meet the capital requirements" and to retain capital needed "to expand in a variety of ways." Tr. 128:20 to 129:2 (Test. of Trimble). American Federal also explicitly advised that it would not pay dividends for a time on the common stock newly issued in January 1989 because it wanted to retain earnings and build its capital position. *See* PX 2022 at iv, 7 (announcing to potential shareholders that "to retain capital for operations and expansion, the Bank's Board of Directors does not currently intend to pay cash dividends on the [c]ommon [s]tock"); PX 2333 (Letter from Abercrombie, to Mildred P. Lloyd, shareholder (June 21, 1991)) ("In the whole series of public meetings we held before our stock went on sale [in 1989], . . . we have taken great pains to state clearly that American Federal has no plans to pay dividends for the foreseeable future."). Moreover, after the breach, the FDIC stated that American Federal "must *continue* [its] efforts to not only meet regulatory requirements, but to attain a level of capital that provides a measure of reassurance to the public that the institution will continue to provide financial services." DX 452D (FDIC Report of Examination (Jan. 21, 1992)) at 1 (emphasis added); *see* Tr. 221:14–22 (Test. of Trimble) ("we [American Federal] knew that [the FDIC] w[as] going to continue to push until we were well capitalized."). Also in this connection, American Federal could not "have operated in [its geographic area] at a minimal level of capital compliance" and thus "[s]ome cushion was

necessary for any bank to operate in [its] marketplace." *Long Island,* 67 Fed.Cl. at 641; *see Old Stone Corp. v. United States,* 450 F.3d 1360, 1370 (Fed.Cir.2006) (affirming the trial court's determination that the plaintiff-thrift was reasonable in its efforts to raise capital in excess of the minimum capital requirements). Thus, as a general matter, in mitigating the breach, American Federal could reasonably take steps to restore its capital position as it existed immediately prior to the breach, and that capital position involved some cushion over minimal capital requirements, although not as much as American Federal wanted to have for its business purposes.

The government further asserts that the bank engaged in the 1993 offering and exchange for business reasons independent of the breach. Def.'s Post–Trial Br. at 24. Specifically, the government contends that the purpose of the offering and exchange was to simplify American Federal's capital structure and possibly to make it more attractive for acquisition. *Id.; see* PX 2441 at 1787. The evidence at trial, however, demonstrated that the primary cause for the bank's actions in 1993 was to raise sufficient capital to comply with the phased-in capital requirements and be relieved from the strictures of the capital plan. *See* PX 2466 at 6 (anticipating that after the offering and exchange the bank would "no longer be subject to various regulatory constraints which have limited its ability to generate loan growth and to pursue market opportunities"); PX 2441 at 1787 ("Exercising the [MPCs] . . . would place the Institution in a 'well-capitalized category' by mid-year 1993."); Tr. 260:2–13 (Test. of Trimble) (stating that if the government had not breached its contracts "[t]here would have been no reason" to have the 1993 offering and exchange).

In arguing against causation, the government contends that American Federal misstates the standard for proving causation because it seeks to apply a "substantial factor" standard. Def.'s Post–Trial Reply at 1–2; *see* Pl.'s Post–Trial Br. at 22 (citing *Indiana Mich. Power Co. v. United States,* 422 F.3d 1369, 1373 (Fed.Cir.2005)). Instead, the government asserts that a "but for" test must be applied to determine whether the breach caused the offering and exchange in 1993. Def.'s Post–Trial Reply at 1–2. This argument has a somewhat artificial quality, however, because the government fails fully to state the applicable legal standard for causation. While the government cites *California Federal Bank* for the proposition that the "substantial factor" test was correctly rejected, *see* Def.'s Post–Trial Reply at 1, albeit in the context of lost profits, *California Federal,* 395 F.3d at 1268, the government ignores that in *California Federal,* the court of appeals elaborated on its direct-causation test by stating that the breach need *not* be "the sole factor or sole cause" of damages. *Id.* at 1268. "The existence of other factors operating in confluence with the breach will not necessarily preclude recovery based on the breach." *Id.; see also Bank of Am., FSB v. United States,* 70 Fed.Cl. 246, 251 (2006) ("no business judgment is exercised in a vacuum . . . [and] it is thus irrelevant that [the bank] may have had independent business reasons" for executing a transaction mitigating the breach). In this case, American Federal did express a desire to be an attractive candidate for acquisition, but that was a secondary objective. Above all else, the bank needed to become capital compliant. *See* Tr. 240:8 to 241:12 (Test. of Trimble) ("[W]e were looking at every possible prospect of ending the government oversight and getting into a normal situation and giving us [the] freedom to be a market player."); Tr. 847:20–23 (Test. of Abercrombie) ("[W]e didn't raise capital [in 1993] just to sell the bank. I mean, this would have been a foolish thing to do. We raised capital to be a competitive market player."). Accordingly, despite the existence of secondary business reasons for American Federal's execution of the 1993 offering and exchange, the court concludes that the bank has satisfied its burden to prove that the government's breach directly caused the 1993 offering and exchange to occur.

As noted earlier, in addition to its broad, unavailing argument that the bank's 1993 offering and exchange was not caused by the breach, the government also makes alternative arguments that portions of the offering and exchange were not so caused. One of those arguments concerns the common

shares offered and sold by the bank in that offering. Def.'s Post–Trial Br. at 25–27. Of the 2,083,955 shares offered and sold by American Federal on March 18, 1993, the government particularly objects to the sale of 810,000 shares of common stock at $8.24 per share as an over-allotment to the underwriters, *i.e.*, the green shoe. As part of the 1993 offering and exchange, American Federal granted the underwriters a thirty-day option to purchase these additional shares "to cover over-allotments." PX 2506 at 1. Mr. Trimble testified that the bank determined the "right amount" of capital to raise in 1993 based on the bank's capital needs, but that "if there was a strong market … there would be [a] green shoe." *See* Tr. 247:15 to 248:3 (Test. of Trimble). As he put it, the green shoe would be triggered if investors thought the bank had made "a particularly attractive offer." Tr. 436:14 to 437:6 (Test. of Trimble). Finally, Mr. Trimble cautioned that a bank that did not include a green shoe in its offering and did not become "well-capitalized … would end up no better off than [it was] to start with." Tr. 2795:22 to 2796:20 (Test. of Trimble). In the event, the secondary offering was quite attractive to investors, and the full amount of the green shoe was exercised, resulting in the sale by the bank of 810,000 additional shares at a price per share, $8.75, that was higher than the bank had first projected. Tr. 248:13–15 (Test. of Trimble) (The underwriters "took 15 percent of the total offering [pursuant to the green-shoe over-allotment, which percentage applied both to the shares sold by the bank and the shares also being sold by the Series A debt holders and the Series I preferred holders], that was a substantial amount … in relation to what we originally planned to do."); *see also* Tr. 249:5–11 (Test. of Trimble) ("[W]e [also] received a better price than we originally anticipated…. So that was a substantial improvement in the per share value that came to the bank.").

The additional capital that the bank raised from the sale of the 810,000 shares of common stock attributable to the green shoe in 1993 further improved the bank's capital po-sition, and the bank was able to employ all of the capital it raised in the secondary offering and exchange very effectively. Its return on average stockholder's equity from 1994 through 1996 was always above 16.0 percent, PX 2827 at 1, and its return on equity was better than that of its competitors. Tr. 500:3–9 (Test. of Trimble). Nonetheless, that it was able to use effectively all of the capital it raised does not by itself resolve the causation issue.

Of the net amount of capital raised by the bank in the 1993 offering and exchange, $29.4 million, $6.674 million was attributable to the green shoe. The difference, $22.726 million, did not approach replacing the regulatory capital in the form of allowable supervisory goodwill lost by the bank in the breach through the disallowance of supervisory goodwill, which totaled $48.702 million as of December 31, 1989. *See infra*, at 614.[28] (The contribution to regulatory capital made by the qualifying Series A and B subordinated debentures was separately replaced by eventual conversion to, or exchange of those securities for, common stock.) Nonetheless, as Mr. Trimble's testimony makes evident, the bank simply had not *planned* on the green-shoe over-allotment to raise replacement capital. Tr. 247:15 to 252:14, 2795:22 to 2797:2 (Test. of Trimble). That the over-allotment was realized stemmed entirely from favorable market conditions and demand for American Federal's offering. In these particular circumstances, the court finds that the breach did not cause the sale of the bank's common shares attributable to the green shoe. Thus, the court will ignore the green shoe in its assessment of damages for the cost of replacement capital.

The government also developed in the later phases of the trial and in post-trial briefing a contention that the bank fully mitigated any losses arising from the breach through its retention of earnings, and consequently did not need to engage in the 1993 offering and exchange. Def.'s Post–Trial Br. at 24–25. This argument is without merit.

**28.** The $22.726 million increment includes $12.625 million in capital added through the exercise of the MPCs.

American Federal, from the implementation of FIRREA through the end of 1992 had increased its tangible equity by $46.9 million, of which $32.7 million was attributable to retained earnings. PX 2455 at 3. As a result, the bank had pulled itself out of the hole it had been in, with negative tangible capital of $12.849 million, to achieve positive tangible capital of $34 million. PX 2455 at 3. At the end of 1992, the bank satisfied all three then-applicable FIRREA capital requirements. PX 2369 (Annual Report (1992)) at 42 (exceeding the then-applicable tangible capital ratio by 1.91%, the core capital ratio by 1.41%, and the risk-based capital ratio by 0.41%). The bank, however, did not meet the fully phased-in FIRREA requirements, and would only have been deemed "adequately capitalized" under FDICIA. *Id.* at 42, 44. At no time during the capital-plan period did the bank have "excess" capital tested against the fully phased-in requirements of FIRREA and FDICIA. See the mitigation analysis, *infra,* at 605–10. Moreover, the government concedes that at the end of 1992 and into early 1993, American Federal had failed to replace all the goodwill and subordinated debt that was eliminated from capital by the implementation of FIRREA. Def.'s Post-Trial Br. at 25. American Federal was entitled to raise sufficient capital to reestablish its pre-FIRREA capital position. *Old Stone,* 450 F.3d at 1370. As addressed *supra,* the bank's 1993 offering and exchange replaced some of the lost goodwill but still left a gap of $26 million in goodwill that was not replaced by that means. Most importantly, however, American Federal's retention of earnings was not caused by the breach although the retention did help ameliorate the breach. Pre-breach, at the time of the modified conversion in January 1989, the bank had explicitly stated its intention *not* to pay dividends but to retain earnings to build its capital position. *See supra,* at 600–01 (quoting PX 2022 at iv, 7 (announcing to potential shareholders that "[i]n order to retain capital for operations and expansion, the Bank's Board of Directors does not currently intend to pay cash dividends on [c]ommon [s]tock.")).

Finally, the government contends that all of the events that occurred after August 1, 1997, beginning with the acquisition of American Federal by CCB and culminating with the merger of National Bank of Commerce into SunTrust Bank in 2004, were remote from the breach and therefore unrelated to American Federal's efforts to mitigate the effects of the breach. Def.'s Post-Trial Br. at 31–33. Plaintiff counters that the acquisition by CCB was not a remote consequence of the breach because the breach caused American Federal to become a target of potential acquirors. Tr. 3274:2 to 3275:12. Mr. Trimble testified that absent the breach, he would not have expected CCB to have acquired American Federal, Tr. 363:12–23 (Test. of Trimble), but he conceded that the only "direct connection" between the government's breach and the merger with CCB was that without the breach American Federal would have been larger in size and a candidate to acquire banks rather than to be acquired. Tr. 312:1–15 (Test. of Trimble). The court concludes that American Federal has failed to satisfy its burden of proof that the implementation of FIRREA caused the bank's merger with CCB in 1997. That merger and all subsequent mergers are remote from the government's breach.

"The general rule is . . . that unrelated events and remote consequences do not reduce the liability of the wrongdoer for the losses caused by the wrong." *LaSalle,* 317 F.3d at 1373 (citing *Southern Pac. Co. v. Darnell–Taenzer Lumber Co.,* 245 U.S. 531, 533–34, 38 S.Ct. 186, 62 L.Ed. 451 (1918)). To remain consistent with this principle, this court must discount remote events regardless of whether they were favorable or unfavorable to the plaintiff. *See id.* In *LaSalle,* the Federal Circuit concluded that the government's breach directly caused an acquiring bank to recapitalize the plaintiff thrift. 317 F.3d at 1372, 1373–74. The court of appeals further held that subsequent commercial activity was neither related "in time or in effect, to the recapitalization of [the bank's] lost goodwill." *Id.* at 1374. In this case, American Federal's 1993 offering and exchange was directly caused by the breach and necessary to mitigate the capital deficit attributable to the breach, but subsequent events were not so caused.

As *LaSalle* indicates, the fact that the subsequent merger with CCB in 1997 was remote from the breach does not, however, also mean that the damages that flow from American Federal's mitigation through the 1993 offering and exchange stopped on the date of the merger with CCB. Instead, damages in the form of the net cost of the replacement capital acquired via the 1993 offering and exchange continued to accrue, as the quoted portion of *LaSalle* teaches. Remote events such as the CCB merger do not enter into the damages calculus, either to increase the amount of damages or to reduce or eliminate the damages. The regulatory capital elided by the breach had a life lasting for fourteen years after 1997 to the end of 2011, and the damages measured by the net cost of replacement capital continue to that point unaffected by remote events. *See also Home Sav. II*, 399 F.3d at 1352 (remote events did not affect damages).

Accordingly, the court concludes that American Federal has satisfied its burden to prove that the government's breaches of its two regulatory-capital contracts with the bank directly caused American Federal to replace its regulatory capital with tangible capital, first in 1990 by exchanging its Series B debentures for Series I preferred stock and then in the 1993 offer and exchange by acquiring new capital by several means.

### 2. *Foreseeability.*

■ American Federal has also proven that the damages it incurred raising replacement capital by undertaking the 1990 conversion and the 1993 offering and exchange were foreseeable. The government contends that "costs of mitigation are only recoverable to the extent that both the type and magnitude of the costs ... were foreseeable when the contract was made." Def.'s Post–Trial Br. at 20. The government's suggestion is that American Federal's replacement of capital was too extensive and costly to be fore-seen at the time the contracts were entered. The government seemingly made the identical argument in *Bank of America v. United States*, 67 Fed.Cl. 577 (2005), which argument the court held to be "without merit." *Id.* at 585 n. 20. In that case, the court concluded that "[t]he government clearly could have anticipated ... that the breach of a contract to count supervisory goodwill toward [plaintiff's] regulatory requirements would have caused plaintiff to raise additional capital in the marketplace and in so doing incur additional costs." *Id.* In this case also, it was foreseeable that American Federal would raise capital to replace that which was lost due to the breach.[29] Moreover, both the type of mitigation that American Federal undertook and the scope and extent of that mitigation were governed by the breach (and circumscribed by mitigation principles). Accordingly, the court holds that American Federal has proven that the damages it incurred in connection with raising replacement capital, by way of the 1990 conversion and the 1993 secondary offering and exchange, were foreseeable.

### 3. *Mitigation.*

■ A party injured by a breach of contract has a duty to mitigate damages. *Long Island*, 67 Fed.Cl. at 642; *see also Tennessee Valley Auth. v. United States*, 60 Fed.Cl. 665, 674 (2004). "[D]amages are not recoverable for loss that the injured party could have avoided without undue risk, burden or humiliation." *Restatement (Second) of Contracts* § 350(1). Nevertheless, an "injured party is not precluded from recovery ... to the extent that he has made reasonable but unsuccessful efforts to avoid loss." *Id.* § 350(2); *see Indiana Mich.*, 422 F.3d at 1375 (quoting *Robinson v. United States*, 305 F.3d 1330, 1333 (Fed.Cir.2002)); *Home Sav. II*, 399 F.3d at 1353.

---

**29.** The government cites *Old Stone* in support of its contention respecting foreseeability. *See* Def.'s Post–Trial Br. at 20 (citing *Old Stone*, 450 F.3d at 1370). *Old Stone*, however, contradicts the government's position. In that case, the Federal Circuit affirmed permitting the plaintiff thrift "to replace the entire amount of regulatory capital eliminated by FIRREA so that the thrift had a cushion against future losses." 450 F.3d at 1370. Moreover, the court of appeals cited to *Home Savings*, in which the Federal Circuit had held that the plaintiff was entitled to recover funds expended in replacing the lost supervisory goodwill, including that portion in excess of minimum regulatory requirements. *Id.* (citing *Home Sav. II*, 399 F.3d at 1352–53).

■ The burden of proof shifts with respect to mitigation such that the burden to prove that the actual steps taken in mitigation of a breach of contract were *unreasonable* rests with the breaching party. *Long Island*, 67 Fed.Cl. at 642 (citing *First Heights*, 422 F.3d at 1316–17; *Globe Sav.*, 65 Fed.Cl. at 348); *Tennessee Valley Auth. v. United States*, 69 Fed.Cl. 515, 523 (2006) (citing also *Koppers Co. v. Aetna Cas. and Sur. Co.*, 98 F.3d 1440, 1448 (3d Cir.1996)). In the present case, the parties have circumscribed the issues somewhat by the positions taken at trial. Specifically, the bank makes no claim for damages attributable to retained earnings. *See also supra*, at 597–98 & n. 26, and 602–03. In addition, the 600,000 detachable warrants that were issued with the Series B subordinated debt in January 1989, and which ultimately were repurchased in 1995, do not factor into a mitigation analysis because neither the bank nor the government rely on the warrants as a basis for either a claim for or an offset to damages. *See* Tr. 3281:17 to 3282:3 (noting that American Federal makes no claim for damages based on the warrants), 3333:22 to 3334:4 (stating that the government seeks no setoff with respect to the warrants). As foreshadowed by the causation analysis *supra*, however, the government challenges the reasonableness of aspects of the bank's efforts to mitigate the losses incurred from the breach through the 1993 offering and exchange.

■ As stated previously, the offering and exchange in 1993 involved conversion of the Series A subordinated debentures, exercise of the attendant Mandatory Purchase Contracts, exchange of the Series I preferred for common stock and issuance of additional common stock in lieu of the deferred dividend entitlement on that stock, and a secondary offering of common stock. The bank stated that it "anticipate[d], based on discussions with . . . OTS, that the Bank w[ould] be released from the provisions of the Bank's Capital Plan shortly after completion of the [1993 offering and exchange]." PX 2506 at 7, 23. The bank also expected that the transactions would enable the bank to exceed immediately the 1996 fully phased-in capital requirements of FIRREA and produce a simplified capital structure. PX 2441 at

1787. American Federal's complicated capital structure would have made it difficult for the bank to raise additional capital through the sale of common stock without first eliminating the Series A debentures, MPCs, and Series I preferred stock through a conversion and exchange for common stock. Tr. 433:4–19 (Test. of Trimble) (the secondary offering would not have been possible without the exchange of the debentures, MPCs, and preferred stock for common stock). Consequently, all of these transactions needed to occur simultaneously.

Moreover, the terms of the Series A subordinated debentures and the Series I preferred forced American Federal to execute the 1993 offering and exchange in the manner that occurred. The Series A debentures did not bear any interest and were purchased with a \$12.4 million premium. PX 2017 § 4.1, Schedule A. If the holders of the Series A debentures, all of which were sophisticated institutional investors, *see supra*, at 590–91 & n. 7, did not convert these debentures to common stock prior to their expiration on January 15, 2004, the holders would have only received their portion of the aggregate principal of \$100,000 at that time. *See* PX 2017 § 12. Consequently, these investors had an extraordinarily strong incentive to convert the Series A debentures into common stock prior to expiration, but at the time of conversion they would have been obligated also to purchase \$12.625 million of common stock pursuant to Section 6 of the debenture agreement. *See id.* at 602–07.

Conversion of the Series A subordinated debentures made sense in 1993 for three critical reasons. Initially, as will be discussed in detail later, American Federal disclosed its plans to pay dividends on its common stock after the offering and exchange. American Federal's investment advisors and officers made presentations during a "road show" to the institutional investors and investment bankers that emphasized American Federal's plans to be more "bank like" and to pay dividends accordingly. Tr. 252:10–11 (Test. of Trimble) ("While we didn't promise any dividends, . . . if you're trying to be bank-like, you're going to have a market that expects it."); Tr. 2804:17 to 2809:8 (Test. of

Trimble) (relationships with investment bankers or "marketmakers" and research analysts prior to the 1993 offering and exchange). By converting the Series A debentures, and necessarily also exercising the MPCs, the institutional investors would begin receiving a return on their investment in the Series A debentures for the first time. Moreover, and importantly, the bank needed the additional capital that the exercise of the MPCs would generate, which capital was a key component in becoming viable, let alone more bank-like. Then too, some of the institutional investors needed immediately to sell at least some of the shares they would receive through the conversion of the Series A debentures and exercise of the MPCs. Several of the institutional investors held sufficiently large quantities of American Federal's securities that they would have held enough of American Federal's stock after the offering and exchange to have become bank holding companies if they did not sell. *See infra*, at 607 n. 30. And, the institutional investors could sell the resulting common stock in the secondary offering at a gain and accordingly realize a profit on their investment made in January 1989.

With respect to the exchange of the Series I preferred stock for common stock, the government contends that this transaction did not mitigate any loss incurred by the bank. Def.'s Post–Trial Br. at 22. The government is correct that upon the 1990 exchange of the Series B debentures for Series I preferred stock, the bank increased its regulatory capital by approximately $13.7 million because the value of the stock, unlike that of the debentures, could be recorded as tangible capital under FIRREA. *See supra*, at 593–94. The government therefore argues that "the exchange of Series I Preferred for common stock ... did not add any regulatory capital to" American Federal. Def.'s Post–Trial Br. at 22; *see* Tr. 2108:8–10 (Test. of Dr. Anjan Thakor, the government's expert).

While the government is nominally correct that the exchange of the Series I preferred for common stock did not add capital to the bank, the government fails to consider the specific terms of the Series I preferred stock, the conversion of which the government has

already conceded was necessary to mitigate the breach. To induce the Series B debentures holders to consent to the 1990 exchange for Series I preferred, American Federal had agreed to provide the holders of the Series I preferred an absolute priority in payments over the holders of common stock or Series A debentures. That priority extended to both the principal amount of the Series I preferred and to the non-cumulative dividends on that preferred. Specifically, in the event another entity acquired the bank, which transaction both the bank and investors believed to be likely, the priority extended to "the sum of ... the Principal Amount Invested for the Series I [preferred stock] and ... such additional amount that will provide ... an annual *pre-tax compound rate of return of 11.25%*, as applied to the Principal Amount Invested for the Series I [preferred stock], less the amount of any cash dividends [previously] paid." PX 2165 at 4 (emphasis added); *see* Tr. 172:5–25, 204:24 to 205:25 (Test. of Trimble) (describing the Series I preferred stock as a "2000 pound gorilla sitting over the top of the common shareholders"). This priority was not an immediate concern during the capital-plan period. The bank had not planned to pay dividends during the early 1990s in all events, but also the bank could not pay any dividends until the capital plan was satisfied and the bank came into compliance with capital requirements. PX 2165 at 2; *see* Tr. 184:5–17 (Test. of Trimble) (stating that in 1990, it seemed like "eons" until American Federal would be capital compliant). However, in early 1993, the Series I preferred stockholders held a priority monetary entitlement, as yet unrealized, that had been steadily increasing since 1990. As long as this entitlement existed and grew on a compounding, pre-tax basis of 11.25%, the bank was constrained because the Series I preferred made it difficult and "very complex" for the bank to raise additional capital. Tr. 204:25 to 205:25 (Test. of Trimble). Mr. Trimble testified that "with the 2000 pound gorilla [, *i.e.*, the as-yet unrealized compounding entitlement,] sitting over the top in the preferred stock, sitting over the top and participating in preference but fully participating with common shareholders, it would have been a significant detri-

ment to trying to get the public offering done." Tr. 240:22 to 241:12 (Test. of Trimble). Thus, to execute a secondary offering and raise additional capital in 1993, American Federal needed to exchange all the Series I preferred stock for common stock. The unrealized compounding entitlement due the Series I investors was addressed by issuing additional common stock in lieu of the accrued entitlement. The court concludes that this aspect of the 1993 offering and exchange was reasonable and necessary to mitigate the harm incurred by the breach. The breach directly caused the initial exchange in 1990 of the Series B subordinated debentures for Series I preferred stock, and the Series I preferred stock thereafter had to be addressed to allow American Federal to raise additional capital to further mitigate the effects of the breach.

Holders of the Series A subordinated debentures and the Series I preferred stock both had to exchange their securities for common stock and immediately to sell at least some of the resulting shares of common stock in a secondary offering. OTS regulations governing the amount of control a stockholder was permitted to acquire in a savings association dictated as much. *See* 12 C.F.R. § 574.4(b)(1)(i) (1993).[30] Mr. Trimble testified that, apart from American Federal's desire to have an offering to sell additional common stock, the holders of the Series A debentures and Series I preferred stock would have requested such an offering because of OTS's restrictions on shareholders owning more than 10 percent of a thrift's common stock. *See* PX 2017 §§ 6.2, 7.1; Tr. 438:3 to 440:5 (Test. of Trimble) (stating that his expectation at that time was that the Series A and Series I holders would "piggyback" onto a secondary offering by the bank and sell their own common stock), 2794:1 to 2795:2. Thus, the court concludes that, based on the terms of the Series A debentures, MPCs, and Series I preferred stock,

the form of the 1993 offering and exchange was a reasonable step in mitigation of the harm arising from the government's breach.

The government next contends that the size of the 1993 offering and exchange was unreasonable. Def.'s Post–Trial Br. at 23–24. This contention dovetails with many of its causation arguments. The government avers that because American Federal satisfied all the minimum capital requirements prior to the secondary offering and exchange and had not previous to FIRREA maintained any " 'target' capital level," "there is no evidence that the 1993 [transactions] w[ere] necessary to mitigate any harm [the bank] may have suffered because" of the breach. Def.'s Post–Trial Br. at 23. More specifically, the government contends that even if American Federal was reasonable in mitigating the effects of the breach by providing for the conversion of the Series A debentures, exercise of the MPCs, and exchange of Series I preferred stock for common stock, the bank's issuance of new shares of common stock in the secondary offering was unreasonable. Def.'s Post–Trial Br. at 25–27. The government asserts that even without the secondary offering of new shares, American Federal would have still been classified under FDICIA as "well-capitalized" after the conversion of the Series A debentures, MPCs, and Series I preferred stock into common stock. *Id.* at 26. In support, the government cites *Home Savings,* in which case the plaintiff-thrift traditionally held a historic cushion of excess capital and had been, before the government's breach, "a conservatively run thrift." *Home Sav. II,* 399 F.3d at 1353.

The court has already held that the breach did not *cause* the sale of the "green shoe," *i.e.,* the underwriters's over-allotment option to purchase 810,000 shares. *See supra,* at 601–02. Consequently, the government's challenge with respect to the reasonableness

---

30. OTS regulations stated that a party "shall be determined, subject to rebuttal, to have acquired control of a savings association, if the [party] . . . [a]cquires more than 10 percent of any class of voting stock." 12 C.F.R. § 574.4(b)(1)(i) (1993); *see* 12 U.S.C. §§ 1467a, 1817(j). Here, after the conversion of the Series A debentures, exercise of the MPCs, and exchange of the Series I preferred

stock for common stock, both the General Electric Pension Fund and Travelers Insurance would have likely possessed greater than 10% of American Federal's common stock, largely because they held significant amounts of both Series A debentures and Series I preferred stock. DX 464D at 4.

of the secondary offering is pertinent to American Federal's sale of 1,273,955 shares of common stock. From the secondary offering, American Federal raised $17,171,789 through the sale of both the newly-issued shares *and* the green shoe, *viz.*, 2,083,955 total shares, at $8.24 per share. *See supra*, at 594–95 & n. 19. Subtracting the proceeds the bank garnered from the sale of the green shoe, which amount equals $6,674,400, the bank raised $10,497,389 from the sale of 1,273,955 shares of common stock.

The government's overall argument that the 1993 offering and exchange was unreasonable because American Federal had satisfied its then-minimum capital requirements by the end of 1992, and thus mitigated all the harm caused by the breach at that time, is unavailing. In American Federal's marketplace, some capital cushion would be necessary for any institution that intended to act like a bank to be competitive. *See Long Island*, 67 Fed.Cl. at 641; *see also Old Stone*, 450 F.3d at 1370; PX 2543 (Wheat First Securities Research (June 1, 1993)) at 2 (describing American Federal's market as dynamic and very active with respect to acquisitions). In 1989, prior to the breach, American Federal possessed a capital cushion of approximately $27.1 million, all of which was attributable to the modified stock conversion in January of that year. *See supra*, at 591–92. Subsequent to the elimination of this excess capital by FIRREA, American Federal increased its tangible equity by $46.9 million over the next three years: $32.7 from retained earnings taking into account amortization of goodwill, plus approximately $13.6 million from the exchange of Series B debentures for Series I preferred stock. PX 2455 at 3. All of the activities by American Federal under its capital plan improved its capital position such that the bank possessed $34.004 million in tangible capital at the end of 1992. *Id.*; PX 2369 at 42. At that time, the bank recorded a tangible capital ratio of 3.41%, 1.91 percentage points or $19.043 million in excess of its then-applicable capital requirements. PX 2369 at 42. American Federal, however, still would not have met the fully phased-in FIRREA requirements for core and risk-based capital by $2.2 million and $12.1 million, respectively.

*Id.* Therefore, the bank's plans for a secondary offering and exchange in 1993 were formulated upon the expectation that the bank would sell enough new common stock to satisfy all of the 1996 phased-in requirements, even if the underwriters did *not* exercise their over-allotment or "green shoe" option. *Id.* at 45. Furthermore, under FDICIA, American Federal was classified prior to the offering and exchange as only "adequately capitalized," and the bank knew that it could be negatively reclassified, and consequently subject to government-imposed conditions, if the bank "receive[d] an unsatisfactory examination rating." *Id.* at 42–44; *see* 12 C.F.R. §§ 565.4(c), 565.6(b), 565.8 (1993). The government's expert, Dr. Thakor, also testified that prior to the 1993 offering and exchange American Federal possessed sufficient capital to satisfy the then-applicable minimum capital requirements, but "did not have sufficient excess capital to grow significantly." Tr. 1988:6–18 (Test. of Thakor). Consequently, the government has failed to prove that American Federal acted unreasonably when it mitigated the harm incurred from the breach by raising enough capital from the 1993 offering and exchange for the bank to create a moderate capital cushion that essentially matched what it had immediately prior to the breach. The resulting question, therefore, is whether the capital that American Federal raised in excess of the minimum capital requirements was unreasonably large. *See Long Island*, 67 Fed.Cl. at 643. According to the OTS examination, immediately after the 1993 offering and exchange, American Federal had excess capital with respect to all three phased-in FIRREA requirements: the bank possessed $44.950 million, $30.215 million, and $18.837 million more than the phased-in tangible capital, core capital, and risk-based capital requirements, respectively. PX 2526 at 2. Subtracting the amount of the "green shoe," the bank would still satisfy the FIRREA requirements. *See id.*; Tr. 693:2 to 697:1 (Test. of Ward). However, further subtracting the amount of capital raised from the planned portion of the secondary offering, $10,497,389, would

cause the bank's cushion to drop significantly below what it had before the breach.[31]

Other evidence presented at trial confirms that the size of the capital cushion American Federal developed as a result of the 1993 offering and exchange was reasonable. American Federal's capital cushion was not unreasonably large compared with those of competing banks. In a Keefe Bruyette presentation to American Federal's Board of Directors from 1997, analyzing the merits of the CCB merger, a peer group comparison showed the tangible capital ratios maintained by other banks that were similar to American Federal respecting their market, asset size, and profitability. DX 980D (Keefe Bruyette Presentation to the Board of Directors of American Federal (Feb. 16, 1997)) at AF8001 0009. On average, at the end of 1996, these ten comparable banks recorded an average ratio of tangible equity to assets of 8.30%. *Id.* In comparison, American Federal recorded a tangible capital ratio of 7.35% after the 1993 offering and exchange. PX 2457 at 17. By the end of 1996, American Federal had attained a tangible equity-to-assets ratio of 8.15%. DX 980D at AF8001 0009.[32] In both instances, American Federal recorded a capital cushion *lower* than the regional market average.

Moreover, William R. Reed, Jr., Vice Chairman of SunTrust Banks, testified that "in the banking industry" banks "typically" operate with tangible capital ratios in a "7 to 10 percent range." Tr. 1796:18 (Test. of Reed). Mr. Reed commented that "bigger banks" tried to operate on less of a cushion than "smaller banks." Tr. 1797:1–4 (Test. of Reed). In general, the capital-ratio range for banks is bounded at the higher end by country banks which may endeavor to operate with tangible capital ratios up to ten percent or more because their loans may be concentrated in one local community or financial market, and at the lower end by national banks which may tend to hold tangible capital as low as six percent but have loans scattered over many communities and business types. The concentration of risk in types of loans is the chief governing factor. Tr. 2384:18 to 2385:3 (Test. of Bradley Waring, a senior examiner with OTS). Regional banks typically fall into the middle of this

31. Moreover, even after the 1993 offering and exchange, the bank did not receive the regulator's top ranking respecting its capital position. In March 1993, the bank examiner, Mr. Ward, re-evaluated American Federal's capital position and he recommended an upgrade of the bank's composite MACRO rating. PX 2492 (MACRO Rating Form (Mar. 22, 1993)). "MACRO" is the acronym for a rating system used by bank regulators to evaluate the viability and strength of banks. *See Long Island*, 67 Fed.Cl. at 624 n. 9. The assessment addressed the effectiveness of *management* and the board of directors, *asset* quality, *capital* adequacy, asset/liability and *risk* management, and earnings *(operations)*. *Id.* A five-point scale was used with "1" being the highest rating and "5" being the lowest. *Id.* In his recommendation, Mr. Ward stated that he only reviewed one aspect of the composite rating, the individual subfactor for capital, and that it should be raised from a 3 to a 2. PX 2492 at 2. Mr. Ward specifically noted that a while a subfactor rating of 1 "could arguably be assigned," he decided to classify American Federal's capital subfactor as a 2 "because of asset quality risk." *Id.* at 2. During the trial, Mr. Ward testified that a bank's asset quality is related to the amount of capital the bank possessed because "that capital is there to absorb potential losses;" thus, "the more capital [a bank possessed], the more risk [that] might be acceptable" and "the greater potential to" receive a MACRO capital subfactor rating of 1. Tr. 726:11 to 727:13, 728:7–12 (Test.

of Ward); *see* Tr. 2384:15–20 (Test. of Bradley Waring, currently a senior examiner for OTS) (testifying that OTS encourages thrifts "to maintain capital ... at prudent levels, commensurate with the[ir] risk profile."). Thereafter, in early 1995, OTS warned American Federal that its capital levels were "considered adequate," but that it needed to "continue to monitor [its] capital position in relation to overall risk exposure levels and *ensure the capital levels remain sufficient to absorb the risk* associated with current and proposed operating strategies." PX 2749 (OTS Report of Examination (Mar. 31, 1995)) at WOL750 1233 (emphasis added). OTS issued the bank such warnings even though at that time American Federal had a tangible capital ratio of 7.66%. *Id.* at WOL750 1232.

32. There is a very slight discrepancy between the tangible equity to assets ratio reported by Keefe Bruyette in its presentation to the Board of Directors of American Federal versus the tangible capital ratio American Federal reported in its 1996 Annual Report. *Compare* DX 980D at AF8001 0009 (indicating that on December 31, 1996 American Federal had a tangible equity to assets ratio of 8.15%), *with* PX 2827 at 34 (stating that on December 31, 1996 American Federal had a tangible capital to total assets ratio of 8.08%).

range. For comparison, at the end of 1996, CCB, described at trial as a "regional" bank, Tr. 321:1–3 (Test. of Trimble), possessed assets of approximately $5.158 billion and had a tangible equity to assets ratio of 8.38%, while American Federal, at that same time, held $1.318 billion in assets and had a tangible equity to assets ratio of 8.15%. DX 980D at AF8001 0009. Once again, American Federal recorded excess capital at a level *lower* than would be expected with a regional bank of American Federal's size. Mr. Reed did caution, however, that while excess capital might make it easier for a bank to satisfy regulators, shareholders might in turn receive a lower return on their investment. Tr. 1797:23 to 1798:1 (Test. of Reed). In the case of American Federal, the bank had sufficient capital to satisfy its needs but did not have excess capital. Subsequent to the 1993 offering and exchange and through the merger with CCB, American Federal consistently satisfied all of its regulatory requirements and paid dividends, gradually raising its dividend payout to approach bank-like levels. *See supra,* at 596. Moreover, the bank's return on average stockholders' equity from 1994 through 1996 was between 16.14% and 17.61%. PX 2827 at 1; *see also* Tr. 500:3–9 (Test. of Trimble) ("American Federal was never overcapitalized because [the bank]'s performance . . . was equal to or in excess of its competitors in return on equity."); PX 2543 (Wheat First Securities Research (June 1, 1993)) at 2 ("At 1.09%, American Federal's first-quarter return on assets not only outpaced its regional thrift peers but was higher than nearly half of the commercial banks we follow.").

Furthermore, the government neglects to consider that the bank would be able to protect itself from future regulatory changes or potential losses by maintaining an acceptable cushion of capital. *See* Tr. 945:8 to 946:5 (Test. of Abercrombie). Accordingly, the court concludes that the government has failed in its burden to prove that the capital cushion American Federal developed after the implementation of FIRREA was unreasonable.

In sum, the government has not established that American Federal's efforts to mit-igate the damage caused by the breach, through the capital raised in the 1993 offering and exchange and the consequential development of a capital cushion, were unreasonable.

### 4. *Reasonable certainty.*

Factually, a plaintiff has the burden to adduce evidence at trial showing that a "sufficient basis exists for estimating the amount of lost profits with reasonable certainty." *Energy Capital Corp. v. United States,* 302 F.3d 1314, 1325 (Fed.Cir.2002) (citing *Chain Belt Co. v. United States,* 127 Ct.Cl. 38, 115 F.Supp. 701, 714 (1953)). In this respect, "[d]amages need not be calculable with mathematical accuracy and are often at best approximate. This is especially true for items such as loss of good will as to which great precision cannot be expected." *Restatement (Second) Contracts* § 352 cmt. a (citation omitted). Nonetheless, a plaintiff's damages must be founded upon "a reasoned conclusion." *Palmer v. Connecticut R. & Lighting Co.,* 311 U.S. 544, 561, 61 S.Ct. 379, 85 L.Ed. 336 (1941).

Particularly where a party injured by a breach has mitigated his or her loss, to ensure that the "injured party [is] not . . . put in a better position than had the contract been performed," the court must take into account both the costs incurred and the benefits gained by that party in making a reasonable determination of the quantum of damages. *See LaSalle,* 317 F.3d at 1371 (internal citation omitted). First, the court must determine all of the costs that the injured party incurred as a result of the breach. The court then must offset any costs avoided or benefits received as a consequence of the breach. *See Bluebonnet Sav. Bank, F.S.B. v. United States,* 339 F.3d 1341, 1346 (Fed.Cir.2003) (per curiam) (concluding that the trial court erred by not determining the "net financial effect" of the government's breach); *LaSalle,* 317 F.3d at 1372; *Bank of Am.,* 70 Fed.Cl. at 248 ("We are aware of no authority that would permit [the court] to award costs associated with a capital infusion while accounting for only a fraction of its corresponding benefits.") (internal citations omitted).

American Federal, through Mr. Jay, its expert witness, presented three models by which damages might be calculated.[33] In his first damages model ("Model I"), Mr. Jay calculated the bank's cost of replacement capital based upon the 2,083,955 newly-issued shares of common stock American Federal sold in the 1993 secondary offering and the 2,340,768 shares of common stock exchanged for the Series I preferred stock. PX 3336 (Corrected Expert Report of John R. Jay (Dec. 13, 2005)) ¶ 24; *see* PX 4001 (John Jay Spreadsheets) tabs 1–7. In this model Mr. Jay derived the cost of replacement capital by totaling the stream of dividends paid by American Federal and its successors, CCB, NCB, and SunTrust, to their shareholders on the resulting shares of common stock, offset by avoided costs and benefits. PX 3336 ¶ 64. Notably, Mr. Jay used the actual dividend rates of American Federal and its successors over the years elapsing until the end of 2011, when the goodwill would have been fully amortized, adjusting the dividend stream for the declining balance of the amortizing goodwill. Tr. 1684:4 to 1685:22 (Test. of Jay); *see* PX 4001 tabs 1–7. Mr. Jay, however, did not include in Model I the costs or benefits arising from the shares of common stock resulting from the conversion of Series A debentures or the exercise of the MPCs. Tr. 1388:10–19 (Test. of Jay); *see* PX 4001 tabs 1–7.

In a second damages model ("Revised Model I"), Mr. Jay corrected a figure he had used in Model I with respect to the principal amount of the Series B subordinated debentures and adjusted the dividend stream to take account of deposition testimony given by the government's expert, Dr. Thakor. PX 3386 (First Supplemental and Rebuttal Expert Report of John R. Jay, CFA (Mar. 21, 2006)) ¶¶ 7–20; *see* PX 4001 tab 8. In particular, in Revised Model I, Mr. Jay calculated a cost of replacement capital for the period after the bank's merger with CCB in 1997, based upon the stream of dividends paid by the bank operating companies that succeeded American Federal to their holding companies, rather than to the holding companies'

shareholders as Mr. Jay had done in Model I. *See* PX 3386 ¶¶ 20–30; PX 4001 tab 9–12. Mr. Jay did not include in Revised Model I any costs or benefits stemming from the conversion of the Series A debentures and the exercise of the MPCs in 1993. Tr. 1621:12 to 1622:22 (Test. of Jay); *see* PX 4001.

Finally, plaintiff offered a third damages model during Mr. Jay's rebuttal testimony ("Model II"). In Model II, Mr. Jay adjusted the calculations set out in Model I and Revised Model I to incorporate all aspects of the 1993 offering and exchange, including those shares of common stock that American Federal issued to the Series A holders upon conversion of their debentures and the exercise of their MPCs. *See* PX 4005. In Model II, Mr. Jay also calculated the cost of replacement capital according to a "prospective analysis." Pl.'s Post–Trial Br. at 46. Mr. Jay endeavored to determine what net costs American Federal would have incurred prospectively from the time the bank actually acquired the various amounts of replacement capital. *Id.* at 45–49. To do so, Mr. Jay applied a formula whereby cost would equal "the difference between the expected return on the replacement securities" and the yield on certain government-backed securities, multiplied by "the lesser of the amount [of] replacement capital or contractual goodwill." *Id.* at 46; *see* PX 4005 (Jay Rebuttal Spreadsheets). Mr. Jay applied the same conceptual analysis to both the capital raised in the 1993 offering and exchange and the 1990 conversion of Series B debentures to Series I preferred stock. Pl.'s Post–Trial Br. at 49–50.

Each of Mr. Jay's models was criticized by the government's experts. Among other things, the government claimed that Mr. Jay included costs that are not recoverable because they are the result of remote consequences. Def.'s Post–Trial Br. at 31–38. In Model I and Revised Model I, Mr. Jay included costs associated with dividends paid by CCB, NCFC, and SunTrust, which dividend payments reflected the dividend policies

---

33. Two experts testifying on behalf of the government during trial, Dr. Anjan Thakor and Dr. Christopher Barry, presented critiques of Mr. Jay's damages models. They did not provide any calculation of the total costs and benefits arising from the government's breach of contract.

of those banks, not American Federal. *See* Tr. 2026:20 to 2030:7 (Test. of Thakor). In addition, in his Model I and Revised Model I, Mr. Jay included stock repurchases made by the parent holding companies after the CCB acquisition, which repurchases reflected the policies and stock prices of those companies, not American Federal. Tr. 2066:15 to 2069:5 (Test. of Thakor). Dr. Thakor also criticized Revised Model I on the ground that the dividend payments by the bank operating companies to the holding companies included in that model did not exclude special dividends paid by the bank operating companies to fund stock repurchases by the holding companies. Tr. 2070:16 to 2076:23 (Test. of Thakor). In addition, the government challenged Mr. Jay's expected-cost Model II on the basis that it measured only "hypothetical costs," not actual dividends paid by American Federal. Def.'s Post–Trial Br. at 44.

Some of the government's objections have merit, and the court does not entirely accept any of Mr. Jay's models as a reliable basis for deriving the costs and benefits arising from the government's breaches. In all three models, Mr. Jay used the dividend rates of the successors to American Federal, *see* PX 4001, 4005; Tr. 1684:4 to 1685:22 (Test. of Jay), which entities arose through business combinations that the court has concluded were remote consequences of the breaches. *See supra*, at 602–03. Model I and Revised Model I also cannot be accepted because they assume that all of the common stock issued by American Federal in the offering portion of the 1993 offering and exchange was replacement capital, and the court has determined that the portion of the offering derived from the "green shoe" was causally not attributable to the breach. *See supra*, at 601–02. Moreover, Mr. Jay's Model I and Revised Model I are defective even from American Federal's perspective because they do not take into account all of the elements of the replacement capital that American Federal raised in the 1993 offering and exchange that were caused by the breach. Specifically, these models omit the effects of the exercise of the MPCs that was attendant to the conversion of the Series A subordinated debentures. The full record established at trial makes up that omission in these first two models. Mr. Trimble's trial testimony during plaintiff's case-in-chief addressed the circumstances of the exercise of the MPCs and the role the resulting capital addition had in replacing lost goodwill. Then, on rebuttal Mr. Jay's Model II drew upon the facts adduced by Mr. Trimble to place in context the capital added by the exercise of the MPCs, but it otherwise added nothing to plaintiff's case for damages stemming from the exercise of the MPCs. Mr. Jay's Model II in other respects suffers from an endemic flaw because it rests upon a spread between a synthetic dividend rate and a yield on government-backed securities as being reflective of actual events, but that approach is not supported by the facts of this case. *See Fifth Third Bank of W. Ohio v. United States,* 402 F.3d 1221, 1237 (Fed.Cir. 2005) (accepting the trial court's rejection of a damages calculation because it was speculative).

Nonetheless, the evidence of record does provide a basis for determining damages to a reasonable certainty, albeit not along the precise lines proffered by Mr. Jay. Adjustments must be made to Mr. Jay's several models to produce a three-segment composite that is suitable for determining damages in this case.

The costs and benefits of the mitigation caused by the breach arise from three sources of replacement capital: (1) the common stock issued upon conversion of the Series A debentures and the attendant exercise of MPCs; (2) the Series B debentures first exchanged for Series I preferred stock, which thereafter was exchanged for common stock; and (3) the common stock issued in the secondary offering, excluding the shares issued via the green shoe. Because each of these sources of replacement capital has differing but-for, non-breach characteristics, the determination of damages will be considered for each instrument in turn, rather than on a consolidated basis as set out in the presentations of Mr. Jay and Dr. Thakor, the parties' experts at trial. In each of these three separate analyses, the effects of the CCB merger and all subsequent business combinations will be ignored because those events are remote from the breach. The three sep-

arate analyses when combined generate an analytically sound measure of the cost of replacement capital.

■ Before analyzing the amount of recoverable damages, the court must first determine exactly how much regulatory capital was eliminated as a result of the government's breach of both contracts with American Federal. The Federal Circuit has previously held that a plaintiff-thrift may raise more capital than is necessary to achieve minimum regulatory capital compliance, but no greater than the amount of regulatory capital that was eliminated as a result of the government's breach. *Old Stone,* 450 F.3d at 1370 (citing *Home Sav. II,* 399 F.3d at 1352–53 (stating that the bank was "entitled to raise funds to replace the supervisory goodwill ... lost as a result of the ... breach")). Therefore, in conjunction with this court's prior determination that American Federal did not raise excess capital, the bank is entitled to recover damages in a particular year based on the net costs of acquiring an amount of capital that does not exceed the amount of regulatory capital eliminated as a result of FIRREA in that same year.

 a. *The regulatory capital elided by FIRREA.*

The implementation of FIRREA eliminated part of the supervisory goodwill that American Federal originally obtained from the acquisitions in 1982 and that remained after the "haircut" in the goodwill recognized as regulatory capital resulting from the substituted contract in late 1988, as implemented in January 1989. For these purposes, it makes no difference that the bank was permitted to record a diminishingly small amount of amortizing qualifying supervisory goodwill through the end of 1994. *See* PX 2109 at 41. In addition, the government's breach barred American Federal from continuing to record its subordinated debt as

regulatory capital as the Bank Board's second contract with American Federal provided. *See* 54 Fed.Reg. 46,866 (Nov. 8, 1989) (removing 12 C.F.R. § 561.13 (1989)).

In determining how much of American Federal's regulatory capital the government's breach eliminated, Mr. Jay applied the contracted amortization schedule to the amount of supervisory goodwill that American Federal would have possessed from the date of the breach through 2011. These calculations applied to the but-for, non-breach scenario. For the actual scenario, he was precise about the goodwill calculations, accounting for that small portion of supervisory goodwill that could still qualify and could be recorded as regulatory capital, on a phase-out schedule, for four years after the implementation of FIRREA. PX 4001 tab 13. Respecting the debentures, however, Mr. Jay took a different approach. In Model I, he asserted that all of the subordinated debt would have been recorded as regulatory capital absent the breach, throughout the term of the pertinent subordinated debenture. PX 4001 tab 8. This was an error; the contract in 1988 for recognition of subordinated debt as regulatory capital did not allow the full amount of the debt to be recognized as regulatory capital over the entire term of the debt instruments. As Dr. Thakor pointed out, regulations of the Bank Board permitted American Federal initially to record all of the subordinated debt as regulatory capital, but thereafter a phase-out schedule applied and only a portion of the subordinated debt could be so recorded. *See* 12 C.F.R. § 561.13(c)(2) (1988); 12 C.F.R. § 561.13(b)(2) (1989). Overall, the supervisory goodwill and the portion of the subordinated debentures that could be recorded as supervisory goodwill, both of which were lost as a result of the government's breach, were as follows:

## TABLE I

| Date | A: Supervisory Goodwill (in 000's) (pre-breach) [34] | B: Qualifying Supervisory Goodwill (in 000's) (post-breach) [35] | C: Qualifying Series B Subordinated Debentures (in 000's) (pre-breach) [36] | D: Qualifying Series A Subordinated Debentures (in 000's) (pre-breach) [37] | Total Regulatory Capital Eliminated (in 000's) = (A–B) + C + D |
|---|---|---|---|---|---|
| 12/31/1989 | 48,702 [38] | 15,987 | 13,639 | 100 | 46,454 |
| 12/31/1990 | 46,489 [39] | 16,187 | 13,639 | 100 | 44,041 |
| 12/31/1991 | 44,275 | 15,830 | 13,639 | 100 | 42,184 |
| 12/31/1992 | 42,061 | 9,974 | 11,730 | 100 | 43,917 |
| 12/31/1993 | 39,848 | 8,346 | 9,684 | 100 | 41,286 |
| 12/31/1994 | 37,634 | 4,705 | 7,774 | 100 | 40,803 |
| 12/31/1995 | 35,420 | 0 | 5,865 | 100 | 41,385 |
| 12/31/1996 | 33,206 | 0 | 3,955 | 100 | 37,261 |
| 12/31/1997 | 30,993 | 0 | 1,909 | 86 | 32,988 |
| 12/31/1998 | 28,779 | 0 | 0 | 71 | 28,850 |
| 12/31/1999 | 26,565 | 0 | 0 | 57 | 26,622 |
| 12/31/2000 | 24,351 | 0 | 0 | 43 | 24,394 |
| 12/31/2001 | 22,138 | 0 | 0 | 29 | 22,167 |
| 12/31/2002 | 19,924 | 0 | 0 | 14 | 19,938 |
| 12/31/2003 | 17,710 | 0 | 0 | 0 | 17,710 |
| 12/31/2004 | 15,496 | 0 | 0 | 0 | 15,496 |
| 12/31/2005 | 13,283 | 0 | 0 | 0 | 13,283 |
| 12/31/2006 | 11,069 | 0 | 0 | 0 | 11,069 |
| 12/31/2007 | 8,855 | 0 | 0 | 0 | 8,855 |
| 12/31/2008 | 6,641 | 0 | 0 | 0 | 6,641 |
| 12/31/2009 | 4,428 [40] | 0 | 0 | 0 | 4,428 |

**34.** With the exception of the amount of supervisory goodwill American Federal recorded at the end of 1989 and 1990, see PX 4001 tab 13.

**35.** PX 4001 tab 13. This is the amount of supervisory goodwill that was allowed to be counted as capital pursuant to FIRREA.

The amount of "qualifying," post-FIRREA goodwill that could be included in a bank's capital changed over the first several years in a counter-intuitive way for American Federal because FIRREA required that the phasing-down amount of the qualifying goodwill had to be determined as a percentage of assets and not on the basis of a phasing-down percentage of the supervisory goodwill previously counted as regulatory capital. See Pub.L. No. 101–73, tit. III, § 301, 103 Stat. 304 (codified as 12 U.S.C. § 1464(t)(3)(A) (providing a transition rule for qualifying supervisory goodwill included in calculating core capital, based on "percentage[s] of total assets")).

**36.** PX 4005 tab 9. The phase-out schedule for qualifying subordinated debentures, pre-breach, is set out in 12 C.F.R. § 561.13(b)(2) (1989).

**37.** See PX 2017 at 11; 12 C.F.R. § 561.13(b)(2) (1989).

**38.** PX 233 at 37.

**39.** A slight discrepancy exists in the record with respect to the amount of goodwill American Federal recorded on December 31, 1990. Mr. Jay asserts that the bank recorded $45.977 million in supervisory goodwill at that time. See PX 4001 tab 13 (citing PX 2275 (OTS Thrift Financial Report (Dec.1990)) at 35). In its Annual Report, however, American Federal reported $46.489 million in supervisory goodwill at the end of 1990. See, e.g., PX 2109 at 42; PX 2457 at 10.

**40.** The government contends that American Federal "overstate[d] the amount of goodwill that would have been available in the absence of the breach" because the goodwill should have been reduced "by $3.7 million for a tax[-]loss carryforward attributable to the [1982] mergers." Def.'s Post–Trial Br. at 47. The government's tax expert, Mr. Larry Johnson, testified that the tax loss was created when loans acquired in the mergers were later sold for a gain under the purchase accounting principles applied for finan-

| | | | | |
|---|---|---|---|---|
| 12/31/2010 2,214 | 0 | 0 | 0 | 2,214 |
| 12/31/2011 0 | 0 | 0 | 0 | 0 |

b. *Series A subordinated debentures and MPCs.*

The noninterest-bearing Series A subordinated debentures were originally issued with a fifteen-year term and were scheduled to expire on January 15, 2004. PX 2017 § 4.1. The investors in these instruments had to convert the securities to common stock prior to the maturation date or the Series A holders would only have received the stated principal of $100,000. Absent conversion, they would have lost the $12.4 million premium that they initially had paid in 1989. Tr. 440:10 to 441:12 (Test. of Trimble). Consequently, the investors would have converted the Series A instruments to common stock no later than their expiration date in the nonbreach world. Thus, as to the Series A subordinated debt, any costs or benefits arising from the breach are limited in time to the period between the conversion on March 18, 1993, and the day before the instruments' expiration date, January 14, 2004. Thereafter, the Series A investors would have converted the debentures into common stock, and the bank would have paid dividends on the resulting stock beginning in early 2004, whether or not the breach had occurred.

The government contests the applicable time period for calculation of damages due to the breach of the contract for recognition of the Series A subordinated debt or regulatory capital. It argues that American Federal improperly assumes that the Series A investors would not have converted their instruments into common stock until just prior to their maturation. Def.'s Post–Trial Reply at 24 (asserting that the conversion would have occurred in 1993). The evidence of record, however, contravenes the government's argument and establishes that the Series A holders would have waited until at or near the end of the term to convert the Series A to common stock.

Pursuant to Section 6 of the Series A debenture agreement, at any time on or before the maturation date, a holder of a Series A debenture could convert that debenture into common stock at the conversion price in effect at the date of conversion, and the holder concurrently would have to purchase its proportionate share of the $12.625 million of additional shares of common stock under the MPCs. PX 2017 at 19–20. The initial conversion price was $5.75 per share for the Series A debentures, and the purchase price for the MPCs was the same, $5.75. *Id.* at 20. The price per share of common stock purchased with exercise of the MPCs, however, would be reduced by the amount of dividends the bank had paid on common stock prior to such exercise. *Id.* at 22–23. The exercise share price, however, could not be lowered to less than $1.00 per share. *Id.* Thus, most importantly, although the Series A debentures bore no interest, they in effect could receive an implicit tax-free "dividend" through a reduction in the exercise price of the MPCs upon each dividend payment that would be made on the common stock. Mr. Trimble testified that the Series A investors would likely hold on to their Series A debt

cial purposes. Tr. 2545:4–15 (Test. of Johnson). However, according to Mr. Johnson, because the bank was not able to apply the same purchase accounting method for tax purposes as it was for financial reporting purposes, those sales created a tax loss rather than a gain. *Id.* The bank could not then use the tax loss, so it was carried forward to future years. Tr. 2545:16–21. The bank ultimately realized the benefit of the tax-loss carry-forward in 1993. Tr. 2545:22 to 2546:1; see also PX 2457 (1993 Annual Report) at 27. As Mr. Johnson put it, the tax-loss carry-forward was a benefit attributable to the 1982 merger transactions that should have reduced goodwill but should have done so at the time the benefit was realized. Tr. 2546:10 to 2547:14. He referred to Statement of Financial Accounting Standards No. 96, as modified by Statement 109. Tr. 2547:25 to 2548:12.

One problem with Mr. Johnson's analysis is that American Federal's goodwill was reduced by agreement of the bank and the Bank Board when the substituted contract for goodwill was entered late in 1988. Mr. Johnson did not take account of that reduction in his analysis, nor did he explain the events and circumstances that would have allowed American Federal to claim the benefit that the tax-loss carry-forward provided. Consequently, the government has not adduced evidence that would cause the court to find that the bank's goodwill should have been reduced, and that it should have been reduced by a particular amount in a particular year. *See* DX 1639D (Supplemental Expert Report of R. Larry Johnson (Jan. 20, 2006)) (arguing that in any event the tax-loss carry-forward would have been eliminated along with the goodwill at the time of the merger of CCB and NCFC).

with its option to convert and purchase common stock until the last available moment for conversion: "Without the breach, [the bank] would have been able to grow and to expand, there would have been no reason for [the Series A holders] to have ever wanted to cash out early." Tr. 2795:9–21 (Test. of Trimble). Moreover, some of these institutional investors were also aware that the percentage of ownership they would acquire upon the conversion of the Series A subordinated debt, plus attendant exercise of MPCs, would exceed the ten percent threshold for bank holding company status. Therefore, as a practical matter, upon conversion, they would be forced to sell at least some of their newly-acquired shares of common stock immediately, rather than reap any benefit from future dividends. See Tr. 2794:19 to 2795:8 (Test. of Trimble); 12 C.F.R. § 574.4(b)(1)(i) (1993). In all events, the Series A investors would have been more concerned about the total proceeds ultimately realized rather than any stream of dividends paid on common stock prior to January 2004. The court therefore concludes that American Federal has proven that the Series A investors would have converted their debentures and exercised the MPCs at or near the last possible date. Damages for the Series A instruments will therefore begin on March 18, 1993, the date of the 1993 offering and exchange, and continue until January 14, 2004, the day before the instruments were to mature.

In determining the costs of replacement capital incurred because of the breach, "it is well established that the payment of dividends is a capital cost." *LaSalle,* 317 F.3d at 1375 (citing *City of Los Angeles v. United States Dept. of Transp.,* 165 F.3d 972, 979 (D.C.Cir.1999)). Upon conversion of the Series A debentures and for the exercise of the MPCs, the bank issued the holders 2,173,912 shares and 2,195,650 shares of common stock, respectively. PX 2457 at 40. Therefore, the bank incurred a cost for every dividend paid on each of these shares of common stock from the third quarter of 1993, when American Federal first issued a dividend of $0.05 per share, through the final quarter of 2003. American Federal itself paid dividends on common stock from the third quarter of 1993 through the third quarter of 1997. Those

actually paid dividends must serve as the cost of this replacement capital for that time. But for the breach, these dividends would not have been paid. Thereafter, in 1997, American Federal was acquired by CCB. A secondary question becomes what dividend rate American Federal would have paid subsequently had the CCB merger not occurred.

The government argues that it is "pure speculation" as to what dividend rate American Federal would have paid absent the CCB merger. Tr. 3294:22 to 3295:5 (defendant's closing). This contention by the government is without merit. The record is replete with evidence and testimony indicating the long-term dividend policy of American Federal. Both Mr. Trimble and Mr. Abercrombie testified that American Federal planned to pay dividends initially "at a conservative level and then [have] a progressive increase" to pay "bank-like" dividends. Tr. 285:1–12; *accord* Tr. 289:11–23, 294:4–12, 2793:14–25 (Test. of Trimble); Tr. 849:16–25 (Test. of Abercrombie); PX 2464 (Dividend Proposal (July 15, 1993)) at AF06 02026. American Federal sought to establish a dividend payout ratio of 33–35% of earnings, which ratio its officers and board believed was comparable to those banks with which the bank was competing. PX 2914 at 2176 (noting in some instances that the payout ratio for comparable banks was higher); *see* Tr. 289:11–23, 294:4–12, 532:1–3 (Test. of Trimble). Moreover, the steadily increasing dividend payment rates of American Federal from 1993–97 support the proposition that the institution was in fact pursuing a plan initially to issue dividends at a conservative rate and then subsequently to increase the payout ratio to a "bank-like" level. *See, e.g.,* PX 2699 at 1986 (raising dividend payout ratio to 20% in October 1994, though still "well below those of most commercial banks"); PX 2852 at 2106 (increasing the payout ratio to 25% in March 1996); PX 2914 at 2176 (increasing the payout ratio to 27% in January 1997).

Based upon this evidence, the court finds that American Federal, after distributing dividends at a 27% payout ratio through the third quarter of 1997, would thereafter begin to pay dividends at its targeted payout ratio of 34%. Thus, as a result of the breach,

based upon the common stock issued in connection with the Series A debentures and the MPCs, the bank incurred the cost of paying dividends on 4,369,562 shares times the actual dividends the bank paid from the third quarter of 1993 through the third quarter of 1997 and thereafter at a dividend payout ratio of 34%, based on the bank's earnings per share in 1997, through the fourth quarter of 2003.

The dividend cost does not extend beyond 2004 even though the capital contributed by the exercise of the MPCs, $12.625 million, in effect made up part of the replacement for the supervisory goodwill that was lost via the breach. That capital would have been added in 2004 even absent the breach because the MPCs would have been exercised then.

To arrive at the net cost of replacement capital arising from the Series A instruments, the avoided costs and benefits that the bank received as a result of the breach must also be taken into account. There are no avoided costs because no interest was payable on the Series A subordinated debentures. The bank did benefit from the infusion of $12.625 million in cash in March 1993, rather than in early January 2004, upon the exercise by the Series A holders of their MPCs. *See* PX 2457 at 40. To determine a net cost of damages, the court must therefore offset the benefits that the bank received from the early infusion of cash attributable to the exercise of the MPCs. In that respect, the Federal Circuit has held that "[t]o account for the inherent benefits of cash over intangible capital, the trial court . . . [must] discount[ ] the award by the 'safe rate' of return [the bank] could [have] earn[ed] by investing that cash." *Home Sav. II,* 399 F.3d at 1354 (stating that cash is more valuable than supervisory goodwill because cash can "both provide leverage and fund loans").

Mr. Jay, in Model I, offset the replacement capital raised in the 1993 offering and exchange by the bank's actual quarterly yield on average assets. *See* PX 4001 tabs 1, 4. Mr. Jay explained that he compared that asset yield to the yield from a thirteen-week U.S. Treasury bill, and chose the for-

mer as a conservative estimate because at no time was the asset yield ever lower than the corresponding yield for a 13–week Treasury bill. *See id.* Tr. 1332:7–13, 1406:4–8 (Test. of Jay). The government did not dispute this part of Mr. Jay's calculation. The court concludes that the use of the bank's actual yield on average assets as a safe rate by which to determine the benefits that American Federal received from the infusion of the MPC proceeds in 1993 is appropriate. In prior cases, plaintiffs have successfully used the rate paid on a comparable government-backed asset as a means to offset the benefits of receiving replacement capital. *See, e.g., Bank of Am.,* 67 Fed.Cl. at 594–95; *Long Island,* 67 Fed.Cl. at 647. In *Long Island,* a rate paid on U.S. Treasury securities was appropriate for use as a safe rate because the banking institution involved actually held such securities. Here, the evidence showed that American Federal held some Treasury securities,[41] and it held larger amounts of mortgage-backed securities insured by government-chartered entities. In all events, the court accepts Mr. Jay's testimony and calculation that the actual yield on average assets was in fact higher than on government-backed securities, thus resulting in a lower overall damages calculation, and therefore the court adopts the yield on average assets as a safe rate by which to determine the offsetting benefit to American Federal for possessing an additional $12.625 million of capital from the second quarter of 1993 through the third quarter of 1997. That safe rate should be adjusted to an after-tax basis, to reflect the fact that the comparable cost, dividends paid, was also on an after-tax basis from the perspective of the bank.

For the period of time subsequent to American Federal's merger with CCB through the third quarter of 2005, Mr. Jay used as the safe rate the actual yield on average assets for all of American Federal's successor banks. *See* PX 4001 tab 1, 4. Because the court has determined that the merger with CCB and subsequent business combinations were remote from the breach,

---

41. In 1990, American Federal owned U.S. Treasury securities having a total market value of $14.950 million and with durations between one and five years. PX 2109 at 32.

the court cannot accept the use of the actual yield on average assets as a safe rate after American Federal had merged with CCB and thereafter. An alternative must be used for these later periods. Such an alternative is readily available; the Federal Circuit has stated that using "the rate paid for a comparable government-backed asset," such as an intermediate-term U.S. Treasury note, is an acceptable way to offset the benefits that a bank received through the infusion of capital because the safe rate " 'account[s] for the difference between what was lost and what was substituted.' " *Home Sav. II*, 399 F.3d at 1354 (quoting *Home Sav. I*, 57 Fed.Cl. at 723).

In Model II, Mr. Jay, as part of his calculations, used the yield from a 10–year Treasury bond issued in 1990, 8.59%, in calculating the benefits that American Federal received from its replacement capital. *See* PX 4005, tabs 1, 6; DX 1278D–A (Treasury Bill, Note, Bond, and TIPS Auction History) at 3. Mr. Jay testified that he used a 10–year Treasury bond, rather than a government-backed security of a different duration, because the "two–, four– and seven-year [T]reasuries are too short" to provide an adequate basis for determining the offsetting benefit to the bank. Tr. 2655:1–3 (Test. of Jay). While the "30–year [T]reasury is, in some respects, more appropriate from a term perspective," to be more cautious, Mr. Jay selected the 10–year Treasury security. Tr. 2655:4–20 (Test. of Jay); *see* PX 4006 (Jay Rebuttal Demonstratives) tab 7. Mr. Jay also noted that the 8.59% yield from the 10–year Treasury bond was higher than the 8.43% yield from the average return on assets at American Federal from 1993 to 1997. *See* Tr. 2655:21 to 2656:9 (Test. of Jay); PX 4006 tab 7. Finally, to account for the tax effects on earnings from a 10–year Treasury bond issued in 1990, Mr. Jay made an adjustment using the 1990 tax rate and concluded that the after-tax yield was 5.6694%. PX 4005 tab 6; *see* Tr. 1517:16 to 1519:7 (Test. of Jay). The court concludes that the use of the after-tax yield on a 10–year Treasury bond issued in 1990, 5.67%, is a reasonable and conservative measure by which to calculate the offsetting benefit of the bank's receipt

of replacement capital which American Federal acquired in 1993.

Accordingly, to determine the offsetting benefit of the government's breach, the following yields should be applied to the capital, $12.625 million, raised from the exercise of the MPCs: (1) American Federal's actual yield on average assets from the third quarter of 1993 through the third quarter of 1997, taken on an after-tax basis, and (2) the after-tax yield from a 10–year Treasury bond issued in 1990, 5.67%, should be applied beginning in the fourth quarter of 1997 and through January 14, 2004.

c. *Series B subordinated debentures exchanged in 1990 for Series I preferred stock.*

Next, the court must determine the damages arising from the Series B debentures that were exchanged in 1990 for Series I preferred stock which was thereafter exchanged for common stock in 1993. The terms of these particular securities have an important bearing on a cost-of-replacement-capital analysis. From a capital standpoint, the shares of common stock that were issued in 1993 were equal in value to the Series I preferred stock, which was in turn equal to the original Series B subordinated debentures. The form and manner of the payment of interest and dividends, however, were markedly different for each. In 1990, when the Series B investors exchanged those securities for Series I preferred stock, they faced the prospect of not receiving any dividends for a considerable time. They consequently bargained hard for, and ultimately received, an absolute priority as to dividend payments and other distributions over the holders of common stock and other junior securities, plus cumulative, compounding preference rights upon certain events which included a merger or a sale of control of the bank. *See* PX 2165 at 4; Tr. 184:5–18 (Test. of Trimble). In addition, the cumulative, compounded preference entitlement was equal to the interest payments, on a tax-adjusted basis, that the Series B holders would have received had they not converted their Series B debentures, from the perspective of the bank. PX 2165 at 2 ("For any quarter a dividend is

declared on shares of Series I the quarterly dividend rate shall be equal ... to the difference between (x) 2.8125%[, *i.e.*, the quarterly interest rate for an annual interest rate of 11.25%,] and (y) the product of (I) 2.8125% and (II) the federal income tax rate paid by the Bank for the fiscal year immediately preceding the fiscal year in which the dividend is declared."). The investors would have had a somewhat different perspective because they would have received a lesser amount consisting of a dividend equivalent to the original interest rate less the tax consequence to the bank.[42] In all events, in 1993, as explained by Dr. Thakor, the government's expert, when the Series I preferred stock was exchanged for common stock, the bank provided the investors with shares of common stock equal in value to the principal amount of the preferred stock, $15 million, plus additional shares equal in value to the amount that, from the perspective of the bank, albeit not the investors, would provide an "11.25 cumulative annual return," *i.e.*, the same interest rate as on the original Series B debentures. *See* DX 1640D (Supplemental Expert Witness Report of Dr. Anjan V. Thakor (Jan. 20, 2006)) ¶¶ 40–42 (citing American Federal's 1993 Form 10–K); Tr. 2025:2–6 (Test. of Thakor).[43]

Respecting the costs that American Federal incurred as a result of the breach, the bank paid dividends on the 2,340,768 shares of common stock exchanged for the Series I

preferred and the attendant cumulative, compounded preference entitlement. As with the shares of common stock issued in connection with the Series A debentures and MPCs, the bank incurred a cost, from the third quarter of 1993 through the third quarter of 1997, based on the actual dividends paid on these approximately 2.340 million shares of stock. Thereafter, beginning in the fourth quarter of 1997, American Federal would have begun distributing dividends at a payout ratio of 34% based on the earnings per share in 1997. *See supra*, at 617.

Similarly to the analysis of damages for the Series A debentures and MPCs, for the Series B subordinated debt, the costs that American Federal incurred from having to pay dividends on common stock that it issued because of the breach are restricted in duration by the terms of the original Series B debentures. Under the terms of the Series B debenture agreement, these instruments would have matured in ten years on January 15, 1999. PX 2016.[44] Also, prior to FIRREA, the bank was permitted to record only a portion of the subordinated debt as regulatory capital, based on a phase-out schedule. *See* 12 C.F.R. § 561.13(b)(2) (third proviso) (1989).[45] The portion of subordinated debt that the bank could no longer record as regulatory capital was in effect merely a regular loan. *See* Tr. 260:19 to 261:1 (Test. of Trimble) (describing the Series B instruments as a "junk bond instrument"). The

---

42. The tax position of individual investors would factor into this analysis. Some of the corporate investors may have been able to use the dividends-received deduction to ameliorate the reduction in the dividend for the bank-related tax adjustment. Nonetheless, damages for costs of replacement capital are determined on the basis of the net costs and benefits to the bank. Thus, the calculation of damages for the Series B debentures need not take into account in terms of costs and benefits the different tax effects of interest payments on debentures versus dividend payments on the preferred stock, because the dividends "paid" in March 1993 by issuance of additional stock, *see supra*, at 594–95 & n. 18, ultimately would have had the same after-tax results as the interest payments, from the bank's perspective. PX 2165 at 2.

43. Dr. Thakor's report was admitted into evidence. However, the document he relied upon for the cited analysis and testimony was Ameri-

can Federal's 1993 10–K, and that document was not admitted at trial. Dr. Thakor's expert opinion could legitimately rely on documentary materials not admitted where such materials were "of a type reasonably relied upon by experts in the particular field." Fed.R.Evid. 703. American Federal's 10–K for 1993 satisfies that criterion.

44. The bank had an option to redeem the Series B debentures beginning January 15, 1996, seven years after the date of the initial sale, based on a redemption price schedule. PX 2016 at 16. Neither party presented evidence indicating that the bank would have exercised this option had the breach not occurred, so this early redemption option will be disregarded.

45. This phase-out schedule was in effect in 1988 when the government and the bank entered into their contract with respect to subordinated debt. *See supra*, at 613; 12 C.F.R. § 561.13(c)(2) (1988).

court has previously held that the implementation of FIRREA, and thus the elimination of the subordinated debt phase-out schedule, breached the bank's contract with the government. *See AmFed II,* 62 Fed.Cl. at 203–205. *See also* 54 Fed.Reg. 46,866 (Nov. 8, 1989) (removing 12 C.F.R. § 561.13, which had prescribed the phase-out schedule applicable before FIRREA). Therefore, the bank may recover damages only for the period of time that it could have recorded this subordinated debt as regulatory capital and then only for that portion of the $15.0 million of Series B subordinated debt that could have been recorded as regulatory capital each year. *See* PX 2016; 12 C.F.R. § 561.13(b)(2) (third proviso) (1989).

In offset of this cost, the bank received the benefit of avoiding the cost of paying interest at 11.25% on that portion of the Series B debentures that could have been counted as regulatory capital from 1993 to 1999. PX 2016; PX 4005 tab 8. As with the costs incurred, however, this avoided-cost benefit is limited to the interest that would have been paid on that portion of the debentures that could have been recorded as regulatory capital during this six-year period. *See* 12 C.F.R. § 561.13(b)(2) (1989); Tr. 2245:9 to 2247:14 (Test. of Thakor) (agreement with this limitation on the benefits that American Federal incurred, namely, the costs that the bank avoided as a result of the breach).

Furthermore, this avoided-cost benefit begins only in March of 1993. There was no "benefit" for the period from December 1989 through March 1993 because the avoided costs consisting of the interest that would have been paid on the Series B debentures during this period were offset by the cumulative, compounding preference entitlement paid out by American Federal in the form of additional stock as part of the exchange of the Series I preferred in 1993.[46]

### d. *Common stock issued in 1993.*

American Federal sold 2,083,955 shares of common stock in 1993 for $8.75 a share that netted the bank $8.24 per share after underwriting costs. PX 2506 at 1. Of the total sale, the bank sold 1,273,955 shares on a planned basis and 810,000 per the underwriters' over-allotment option or "green shoe." *See id.* at 4; PX 2532 at 17. The court has determined that the government's breach caused the bank to sell the planned 1,273,955 shares but not the shares attributable to the green shoe. *See supra,* at 601–02.

The substituted contract between the government and the bank permitted American Federal to record an amortizing amount of supervisory goodwill through the fourth quarter of 2011 as regulatory capital. Thus, the bank is entitled to recover damages equal to the amount of dividends it actually paid on the 1,273,955 shares of common stock from the third quarter of 1993 through the third quarter of 1997, plus the dividends the bank would have paid on these shares from the fourth quarter of 1997 through the fourth quarter of 2011, based on a dividend rate equal to a 34% payout ratio of earnings per share in 1997, and subject to the limitations that follow.

Under the substituted contract entered into by the bank and the government in 1988, the supervisory goodwill that the bank acquired from the 1982 acquisitions could be recorded as regulatory capital based on an amortization schedule through the end of 2011. *See AmFed II,* 62 Fed.Cl. at 193; PX 4001 tab 13. Accordingly, American Federal may not recover damages from the payment of dividends on these shares of common stock in a particular quarter, greater than the share-equivalent amount of supervisory goodwill that the bank would have been able to record as regulatory capital at that same time, taking into account also the tangible capital contributed through the exercise of the MPCs up to January 14, 2004. *See Old Stone,* 450 F.3d at 1371; *supra,* at 613–15 (Table I, setting out American Federal's reg-

---

**46.** Technically, there is a small difference between the interest that would have been due and the payment made for the cumulative, compounding preference entitlement because the interest would not have been compounded for these damage calculations but the preference entitlement was compounded. This difference works to the detriment of American Federal and to the benefit of the government, but the amount of the discrepancy is relatively small and it will be disregarded.

ulatory capital eliminated by FIRREA); *supra*, at 594–95 (capital contributed by the exercise of the MPCs).

In addition, the benefit conferred by the tangible capital must be subtracted from the dividend-related cost. The calculation of benefits shall be made on the same basis as that used for the capital acquired as a result of the exercise of the MPCs, as described *supra*.

### 5. *Computation of present value.*

■■■ A court that awards expectancy damages for breach of contract should discount any part of the award that reaches beyond the date of judgment to avoid unjustly enriching the plaintiff. *See Energy Capital II*, 302 F.3d at 1330; *see also Energy Capital Corp. v. U.S.*, 47 Fed.Cl. 382, 415 (2000) (*"Energy Capital I"*) (stating that the "value of a particular sum of money presently held is greater than the value of the same to be received in the future").

Discounting the post-judgment portion of a damages award requires use of an appropriate discount rate, and the determination of the discount rate is a question of fact for the court. *Energy Capital II*, 302 F.3d at 1330. "In a case where [expectancy damages] have been awarded, each party may present evidence regarding the value of those [damages], including an appropriate discount rate." *Id.* at 1333. A default rate may be used where evidence about an appropriate discount rate is lacking or unsatisfactory as a basis for a finding of fact: "When there is no evidence in the record pertaining to the discount rate to be used when discounting a damages award, it certainly is appropriate for a court to apply a risk-free conservative discount rate to discount a damages award to present value." *Id.* at 1333–34.

Here, plaintiff proposes a discount rate of 5.5% for post-judgment damages. PX 3336 ¶¶ 96, 133–36; Tr. 1697:18 to 1698:24 (Test. of Jay); *see* PX 4001 tab 8; PX 4005 tabs 4, 5, 11. Mr. Jay used the discount rate of 5.5% because it was the annual yield for 15–year fixed rate subordinated bank notes that SunTrust issued in April 2005. PX 3336 ¶ 96.

Mr. Jay testified that 5.5% was an appropriate discount rate because "it is less than half of the current [SunTrust] dividend" and the discount period for future costs is a "very short term period" of only five years, assuming judgment would be entered in 2006. Tr. 1364:11–23, 1429:8–19 (Test. of Jay).

The government's expert, Dr. Thakor, criticized Mr. Jay's proposed use of a 5.5% discount rate, *see* Tr. 2171:4–7 (Test. of Thakor); DX 1640D ¶ 136, but the government did not advocate any particular rate. In illustrative computations, it used various discount rates roughly double that proposed by Mr. Jay. *See* DX 1640D ¶¶ 137–38 (applying various discount rates including 12% based on SunTrust's cost of equity from 2003 and 9.28% based on SunTrust's cost of equity from the end of 2005).

The court concludes that the discount rate proffered by plaintiff is not appropriate in the circumstances. The yield of a specific debt instrument is some evidence of a low-risk expected return over the near term on a debt security, but the damages in this case represent a net cost of replacement capital that in effect implicates elements of a return on equity. *See Energy Capital II*, 302 F.3d at 1333–34.

In the Federal Circuit's decision in *Energy Capital II*, the court was guided by the holding in *Northern Helex Co. v. United States*, 225 Ct.Cl. 194, 634 F.2d 557 (1980), where the Court of Claims applied a discount rate of 9% "derived from currently available conservative investment instruments." *Id.* at 564. In this case, evidence was presented at trial regarding the yield from a 10–year U.S. Treasury note issued in 1990, DX 1278D–A at 3, and from 5–year and 10–year Treasuries issued in 2006. *Id.* at 4. The yield from a 10–year Treasury note issued in 1990 was 8.59% while the yield of a similar security issued earlier in 2006 was approximately 4.5%. *Id.*[47] Taking into account these yields, as well as those proffered or used by the parties, and making an equity-based adjustment, the court determines that an appropriate discount rate in this instance is 8.0%.

---

47. The court takes judicial notice that on the day before this opinion was issued the yield of a 10– year Treasury note was 4.75%. See Markets Diary, *Wall Street Journal*, Sept. 1, 2006, at C1.

Accordingly, the expectancy damages that are awarded to American Federal for the period after November 1, 2006, the date on or by which final judgment in this case is expected to be entered, shall be discounted at a rate of 8.0%.

### B. Incidental Losses

American Federal seeks to recover five categories of incidental-loss damages that it asserts were incurred because of the government's breach. These expenses, denominated "incidental losses" by the Restatement, are recoverable as damages insofar as "they protect[ed] the injured party's expectation interest but are separate and distinct from" the cost of replacement capital. *Globe Sav.*, 65 Fed.Cl. at 361 (citing *Restatement (Second) Contracts* § 347 cmt. c).

#### 1. *Transaction costs.*

■■ Plaintiff seeks $1.61 million in transaction costs associated with the 1993 offering and exchange. Pl.'s Post–Trial Br. at 62. The parties have stipulated that "American Federal incurred approximately $1.61 million in transactions cost[s] in connection" with the 1993 offering and exchange. Stip. ¶ 32. The government, however, contests causation, contending that plaintiff has failed in its burden to prove that the government's breaches caused the secondary offering and exchange. Def.'s Post–Trial Br. at 61 n. 14. The government's argument is unavailing; American Federal has satisfied its burden of proving causation respecting the 1993 offering and exchange. *See supra*, at 602–04. Therefore, the court awards American Federal $1,610,000 in transaction costs arising from the 1993 offering and exchange.

#### 2. *Cost of deposit insurance.*

■■ American Federal also seeks $406,538 in increased premiums for deposit insurance on the ground that the government's breaches caused American Federal to pay higher fees in 1993. Pl.'s Post–Trial Br. at 63. The government argues that the bank failed to present sufficient evidence to sup-

port this claim, Def.'s Post–Trial Reply at 27–28, noting specifically that American Federal seeks recovery of the increase in FDIC premiums paid in the second half of 1993 despite the fact that the bank was classified as "well-capitalized" at that time. *Id.* at 28 n. 12.

In September 1992, the FDIC instituted a new schedule of rates that depository institutions would pay for deposit insurance. PX 2506 at 57. These rates for insurance premiums ranged from $0.23 to $0.31 for every $100 of deposits. *Id.* Under the FDIC rate schedule, an institution was assessed according to its level of capitalization and MACRO rating; banks with better MACRO ratings paid lower insurance premiums. *See* PX 2506 at 57; Tr. 223:20 to 224:1 (Test. of Trimble); 765:14–24 (Test. of Waring) (stating that the "insurance costs were tied into the MACRO rating").[48] In 1993, American Federal paid its premiums for deposit insurance in two installments. In the first half of the year, the bank had $812,245,925 in its "average assessment base" of deposits against which the highest available rate was assessed, 0.00155, *i.e.,* equivalent to $0.31 per $100 of deposits on an annual basis. DX 1662D (FDIC Savings Association Insurance Fund ("SAIF") Certified Statement (Jan. 31, 1993)). As a result, American Federal was assessed $1,258,981 for that half-year. *Id.* In the second half of 1993, American Federal recorded $815,018,034 as its average assessment base of deposits and was assessed a rate of 0.00130, *i.e.,* equivalent to $0.26 for every $100 in deposits on an annual basis. DX 1664D (SAIF Certified Statement (Aug. 5, 1993)); *see* Tr. 614:2–18 (Test. of Trimble). The bank thus was assessed and paid $1,059,523.44 for that half-year. DX 1664D.

American Federal contends that had the breaches not occurred, the bank would not have been assessed the higher FDIC insurance premium rates. *See* Tr. 583:18–24 (Test. of Trimble). The record reflects that the bank received low MACRO ratings in

---

**48.** After FIRREA, the rating system known by the "MACRO" acronym, was modified and thereafter used the "CAMEL" acronym. *See Globe Sav.*, 65 Fed.Cl. at 339 n. 6 (2005). The CAMEL assessment addresses the same topics as MACRO but

referred to them as capital, assets, management, earnings, and liability. As before, a rating of "1" was the highest rating, and a rating of "5" was the lowest.

1991 and 1992 because American Federal did not comply with the new post-FIRREA capital requirements. Tr. 215:7–22 (Test. of Trimble); *see* PX 2506 at 57 (expecting that the bank would pay a high insurance premium because it was classified as "undercapitalized" in mid–1992); PX 2492 at 1 (indicating that American Federal received MACRO composite ratings of 4 on July 29, 1991 and 3 on November 16, 1992). However, within days of the 1993 offering and exchange, American Federal received a MACRO composite rating of 2, PX 2492 at 1, and then was classified "well-capitalized" under FDICIA. PX 2457 at 18; Tr. 726:11–24 (Test. of Waring).

The court concludes that the government's breaches caused American Federal to pay higher FDIC insurance premiums in both the first and second half of 1993. Moreover, the court adopts the calculations offered by plaintiff. *See* Pl.'s Post–Trial Br. at 18–19, 63. Accordingly, American Federal is awarded $406,538 in damages arising from the payment of higher FDIC insurance premiums.[49]

### 3. *Increased OTS assessments.*

Plaintiff seeks $52,543 in increased OTS assessment costs in 1992. Pl.'s Post–Trial Br. at 64. The government concedes this claim. Def.'s Post–Trial Reply at 26 n. 11. Accordingly, the court awards American Federal $52,543 in damages arising from increased OTS assessments.

### 4. *Cost of securitizing residential loans.*

The bank further seeks $1.541 million for the costs incurred in securitizing residential loans from 1990 through 1993. Pl.'s Post–Trial Br. at 62–63. American Federal began to convert residential mortgage loans into mortgage-backed securities pursuant to its capital plan expressly to reduce the bank's risk-based profile and thus help meet capital requirements. PX 2506 at 34–35; *see* Tr. 208:23 to 209:8 (Test. of Trimble) (stating

that besides helping to become capital compliant, there was no "other business purpose" for converting these residential mortgage loans). The bank had not previously engaged in such a securitization program. Ultimately, American Federal securitized $47.918 million, $55.634 million, $48.891 million, and $1.654 million of mortgage loans in 1990, 1991, 1992, and 1993, respectively. PX 2506 at 35; PX 2457 at 22. Mr. Trimble testified that it cost the bank "around 25 basis points" on a recurring basis to securitize these loans from 1990 through 1993, and that there was no manner in which the bank could have avoided such a cost. Tr. 208:5–22, 213:19–22, 345:11 to 346:6 (Test. of Trimble). Finally, Mr. Trimble estimated that these mortgage loans had a weighted averaged life of eight to ten years. Tr. 346:13–22 (Test. of Trimble).

American Federal calculated the total costs it incurred for having to securitize these mortgage loans by multiplying the total volume of mortgage-backed securities, during the three-plus-year period, $154.097 million, by fifty percent "to account for the decline in balances as the loans pay down," multiplied again by 25 basis points, and multiplied finally by a factor to account for an eight-year weighted average life. Pl.'s Post–Trial Br. at 62–63; *see* Tr. 213:23 to 214:25, 345:17 to 346:22 (Test. of Trimble).

The government offers several arguments in response to this claim. First, the government contends that the securitization of these mortgage loans was not caused by the breaches. *See* Def.'s Post–Trial Reply at 26–27. That contention is without merit; the bank's securitization program was caused by the breaches. PX 2190 at AF58 00819 (stating in the second amendment to the capital plan that the bank securitized residential mortgage loans "to reduce risk-based assets and the risk-based capital requirement"). Second, the government contends that Amer-

---

**49.** American Federal deducted $40,612.11 from its damages calculations for its claim with respect to FDIC insurance premiums. The bank apparently received a refund in that amount from the FDIC based upon an error in calculating American Federal's FDIC insurance premium for the first six months of 1993. Tr. 617:20 to 618:19 (Test. of Trimble). The court notes

that evidence of this refund arises only in testimony from Mr. Trimble while he was being questioned about a document that was neither offered nor admitted into evidence. *Id.* (discussing DX 1663D (FDIC SAIF Error Verification Report (June 4, 1993))). Nonetheless, American Federal has conceded that it received the refund, and its calculations reflect the deduction.

ican Federal did not offset the benefits it received from sales of mortgage-backed securities it made in 1991 and 1992, resulting in $3.6 million in proceeds. Def.'s Post–Trial Reply at 27 (citing PX 2369 at 29). This contention also fails because American Federal did not sell any of the securitized residential mortgage loans in question; rather, those securities were held for investment. The bank did sell a small amount of other mortgage-backed securities that it had classified as available for sale. *See* Tr. 596:18 to 597:20 (Test. of Trimble); PX 2369 at 20 (indicating that $130.775 million and $141.509 million mortgage-backed securities were held for investment in 1991 and 1992, respectively).

The court concludes that American Federal has satisfied its burden to prove the costs it incurred from securitizing mortgage loans with reasonable certainty. *LaSalle,* 317 F.3d at 1374; *Restatement (Second) Contracts* § 352 cmt. a. Accordingly, the court awards American Federal $1,541,000 in damages arising from the costs the bank incurred from securitizing residential mortgage loans from 1990 through 1993.

### 5. *Management time.*

■ The bank finally seeks "at least $222,075" in damages arising from the amount of time that Mr. Abercrombie and Mr. Trimble, American Federal's CEO and CFO, respectively, "devoted to the breach-necessitated capital plan." Pl.'s Post–Trial Br. at 63–64. For such a claim, the burden is on American Federal to prove that the "use of the internal resources by [the bank] deprived it of the ability to employ those resources on other projects. That [American Federal] would have paid [these two officers] in all events is not material to this inquiry." *Tennessee Valley Auth.,* 69 Fed.Cl. at 537–39.

In *Tennessee Valley Authority,* the plaintiff adduced evidence of the hours and responsibilities of some employees on the project for which damages were sought, and the unavailability of those employees for other work, but it did not provide such evidence as to other employees. 69 Fed.Cl. at 540. Damages were allowed only for the expenses attributable to those employees respecting whom detailed evidence was provided. *Id.* Here, American Federal failed to present any detailed evidence indicating the time and resources spent by the bank's managers working on the capital plan rather than other aspects of the bank's operations. Mr. Trimble and Mr. Abercrombie offered, at best, vague and unreliable estimations of the amount of time that they devoted to activities related to the capital plan. *See* Tr. 165:3–19 (Test. of Trimble) ("it's hard to identify" how much time was spent preparing the capital plan); 232:8 to 233:10 (Test. of Trimble) (noting that in the first year issues related to the capital plan took up 100% of the time, and thereafter "maybe 25 percent [or] 30 percent"); 831:4 to 832:2 (Test. of Abercrombie) (stating that working on the capital plan took "sometimes ... 30, 50 percent, sometimes ... 80 percent" of the time). In short, American Federal has presented insufficient evidence to prove the extent to which Mr. Abercrombie and Mr. Trimble were diverted from their other responsibilities at American Federal and what resulting costs the bank incurred. Accordingly, the court finds that there is a failure of proof respecting the bank's claim for incidental damages based on the amount of time its management spent working on issues related to the capital plan, and it awards no damages in that respect.

### 6. *Synopsis of incidental losses.*

The court awards American Federal incidental losses totaling $3,610,081, comprised of transaction costs associated with the 1993 offering and exchange of $1,610,000, increased insurance premiums to the SAIF of $406,538, increased OTS assessment costs of $52,543, and the cost of securitizing residential loans of $1,541,000.

### C. Tax Gross–Up

■ American Federal requests that the court award cost-of-replacement-capital damages on a pre-tax basis, applying a "tax gross-up" on the award to put plaintiff in the same end position as it would have been had the breach not occurred. Pl.'s Post–Trial Br. at 58–60. Such a tax gross-up rests on the postulate that the damage award will be subject to income taxation when received but that the award should not actually be taxed as income because it reflects a replacement

capital item. In this respect, the Federal Circuit has stated "that a tax gross-up is appropriate when a taxable award compensates a plaintiff for lost monies that would not have been taxable." *Home Sav. II,* 399 F.3d at 1356 (citing *Oddi v. Ayco Corp.,* 947 F.2d 257, 267 (7th Cir.1991); *First Nationwide Bank v. United States,* 56 Fed.Cl. 438, 449 (2003); *LaSalle Talman Bank, F.S.B. v. United States,* 45 Fed.Cl. 64, 110 (1999), *aff'd in part and vacated in part,* 317 F.3d 1363 (Fed.Cir.2003)). Consequently, a plaintiff seeking a tax gross-up has the burden to "show with reasonable certainty that the gross-up is necessary to make plaintiff whole, [that] the award will be subject to taxation and, for purposes of calculating the gross-up, that the award will be taxed at a certain rate." *Citizens Fed. Bank, FSB v. United States,* 59 Fed.Cl. 507, 521 (2004). "In most . . . instances [where a court has not awarded a tax gross-up], trial courts found that the plaintiff failed to satisfy its burden of establishing to a reasonable certainty the need for a gross-up." *Long Island,* 67 Fed.Cl. at 655 (internal citations omitted).

■ Here, as in several other recent cases, "[t]here is reasonable certainty that a damages award for the cost of replacement capital would be necessary to make plaintiff[ ] whole because the Federal Circuit has held that such an award compensates a plaintiff for 'lost monies that would not have been taxable [, *i.e.,* the goodwill].' " *Long Island,* 67 Fed.Cl. at 655–56 (quoting *Home Sav. II,* 399 F.3d at 1356, and citing I.R.C. § 118 ("[i]n the case of a corporation, gross income does not include any contribution to the capital of the taxpayer.")). The bank has satisfied its burden to prove with reasonable certainty that an award of damages based on the cost of replacement capital would be taxable. Pl.'s Post–Trial Br. at 58–59. "[U]nless excluded by law," "all income" is taxable as gross income without consideration of its sources. Treas. Reg. § 1.61–1(a); *see*

I.R.C. § 61(a). Based upon the "expansive language" of the definition of gross income under I.R.C. § 61, the likelihood that an award of damages in this case would *not* be taxed as income is "not . . . high." *Long Island,* 67 Fed.Cl. at 656; *see also LaSalle Talman Bank, F.S.B. v. United States,* 64 Fed.Cl. 90, 116 (2005), *aff'd,* 462 F.3d 1331, 2006 WL 2457310 (Fed.Cir. Aug.25, 2006); *Fifth Third Bank v. United States,* 71 Fed. Cl. 56, 96 (2006), *on remand from Fifth Third Bank of W. Ohio,* 402 F.3d 1221. Damages awarded "on account of personal injuries or physical sickness" are the only damages specifically excluded from the definition of gross income. I.R.C. § 104(a)(2), *declared unconstitutional in part by Murphy v. I.R.S.,* 460 F.3d 79 (D.C.Cir.2006) (statute violated the Sixteenth Amendment insofar as it permitted taxation as income of damages for a non-physical personal injury unrelated to lost wages or earnings); *see also United States v. Burke,* 504 U.S. 229, 233, 112 S.Ct. 1867, 119 L.Ed.2d 34 (1992). The court therefore holds that there is a reasonable certainty that damages awarded in this case based on the cost of replacement capital will be taxed.

The bank has also satisfied its burden to prove with reasonable certainty the appropriate tax rate that should be applied to gross-up a damages award for cost of replacement capital. Pl.'s Post–Trial Br. at 59–60. American Federal asserts that any damages awarded for cost of replacement capital should be grossed-up for taxes at a rate "of at least 37.47 percent." *Id.* at 60. Gregory Weaver, the Director of Tax Planning for SunTrust,[50] testified that SunTrust Bank's actual combined federal and state tax rates in 2003 and 2004 were 37.52% and 37.35%, respectively. Tr. 1049:3–12 (Test. of Weaver); *see also* PX 3361 (Marginal Tax Rate Analysis—SunTrust Bank (Dec.2005)) at AF–ST 26244.[51] These tax rates incorporate

---

50. Mr. Weaver is a group vice-president at SunTrust Bank, as well as Director of Tax Planning. Tr. 1025:13–15 (Test. of Weaver). His "group is responsible for projecting tax rates for the company as a whole, and . . . also provide[s] tax technical guidance to [SunTrust Bank's] business partners in an effort to try to ensure that the

company engages in tax efficient transactions." Tr. 1025:16–21 (Test. of Weaver).

51. Prior to December 2005, Mr. Weaver had calculated projected combined federal and state tax rates for SunTrust Bank for 2004, 2005 and 2006. Tr. 1063:17–22 (Test. of Weaver). By December 2005, Mr. Weaver was able to incor-

both the federal marginal tax rate of 35%, the various state effective rates, and the benefits that SunTrust Bank receives on its federal tax rate for having to pay state taxes. Tr. 1051:14–1053;18; PX 3361 at AF–ST 26244. Mr. Weaver also projected that Sun-Trust Bank's combined federal and state tax rates in 2005, 2006, and 2007 would be 37.65%, 37.53%, and 37.47%, respectively. Tr. 1049:20–1050:5; PX 3361 at AF–ST 26244; PX 3362 (Marginal Tax Rate Analysis—SunTrust Bank (Jan.2006)) at AF–ST 26252. The government has not proposed an alternative applicable rate for the purposes of a tax gross-up and largely does not criticize the calculations that Mr. Weaver performed. The court accepts Mr. Weaver's testimony and calculations as establishing SunTrust Bank's marginal tax rate to a reasonable certainty.

Based on SunTrust Bank's most recent actual marginal tax rate, and to reflect the lowest combined tax rate paid by SunTrust in recent years, the court will provide a tax gross-up to the award of damages for the cost of replacement capital at a marginal tax rate of 37.35%. In reality, this aspect of the court's decision will cause the government to pay SunTrust Bank an amount of money that SunTrust Bank will thereafter return to the government when the bank files its tax payments for the year in which the bank receives its damages award. In the event this series of events does not actually occur, the court will be receptive to a motion under RCFC 60(b) to reopen the judgment in this case to rectify any anomaly.

### D. Motion for Costs

On July 7, 2006, the government filed a motion for costs asking that plaintiff be required to pay the government's reasonable expenses in connection with its efforts to respond to Mr. Jay's expert report, Revised Model I, submitted on March 21, 2006, and Mr. Jay's rebuttal testimony given on April 18, 2006. Defendant's Motion for Costs ("Def.'s Costs Mot.") at 1, 4. After completion of briefing on August 1, 2006, this motion for costs is also ready for disposition. For the

reasons stated below, the government's motion is denied respecting costs associated with addressing Mr. Jay's Revised Model I, but granted with respect to costs incurred with relation to Mr. Jay's rebuttal testimony.

After the court's decision in *AmFed III*, addressing cross-motions for summary judgment on damages, discovery was reopened, and the parties were permitted "to designate any new rebuttal experts and amend existing expert reports." Order of Nov. 21, 2005. Subsequently, in a timely manner, Mr. Jay submitted his report setting out Model I, and Dr. Thakor submitted his amended expert report. *See* PX 3336; DX 1640D. The renewed period for discovery was compressed to allow trial to commence on April 3, 2006, as previously scheduled. On March 21, 2006, several weeks prior to the commencement of trial, Mr. Jay submitted Revised Model I, *see* PX 3386, which expert report the government moved to exclude on the grounds that it was not proper supplementation under RCFC 26(e) and was untimely. Defendant's Motion In Limine to Exclude the Supplemental Expert Report of John R. Jay and for Expedited Briefing and Consideration, at 1. The court denied the motion respecting two portions of Mr. Jay's Revised Model I, but deferred the government's motion regarding a third and concluding portion of Mr. Jay's revised model. Order of Mar. 28, 2006. In that order, the court directed that "Mr. Jay should be made available for deposition prior to his testimony at trial" to ensure "that defendant and its experts have a full and fair opportunity to examine Mr. Jay's [Revised Model I], and to explore any difference in methodology [that might exist between the models]." *Id.* The government deposed Mr. Jay on March 31, 2006. Def.'s Costs Mot. at 4. Ultimately, the court denied the deferred aspect of the government's motion to exclude the third portion of Mr. Jay's Revised Model I. Tr. 1311:6–19.

On April 17, 2006, as trial was proceeding and after defendant had rested its case-in-chief, the parties prepared for plaintiff's rebuttal testimony. In that connection, counsel

porate the latest information from SunTrust Bank's filed 2004 tax return and arrive at an actual tax rate for 2004, and to provide updated

projections for 2005 and 2006. Tr. 1063:20 to 1064:8 (Test. of Weaver).

for American Federal delivered rebuttal spreadsheets and demonstratives, prepared by Mr. Jay, to the government in anticipation of rebuttal testimony to be presented by Mr. Jay. Def.'s Costs Mot. at 4; *see* PX 4005, 4006. On the following day, April 18, 2006, the government sought to bar American Federal from presenting any case in rebuttal, but the court allowed Mr. Jay to testify in rebuttal as scheduled, while reserving a ruling on whether the government's objection would be sustained as to any of his testimony. Tr. 2623:10–12, 2624:16–19. Upon completion of his testimony on April 18, 2006, the government requested that it be granted leave to defer cross-examination of Mr. Jay until May 16, 2006, which request the court granted. Tr. 2703:13–20, 2705:12–14. Trial was then suspended, and the government deposed Mr. Jay on May 2, 2006. Def.'s Costs Mot. at 4. Upon the resumption of trial on May 16, 2006, Mr. Jay was cross-examined, and the government then put on its rebuttal case.

 This court has authority to impose discovery sanctions under RCFC 37(c) or pursuant to the court's inherent authority. *See In re Bailey,* 182 F.3d 860, 864–65 (Fed. Cir.1999) (inherent authority of the Court of Appeals for Veterans Claims). The decision on whether to impose discovery sanctions, either pursuant to the court's inherent authority or under the court's rules, rests within the sound discretion of the court. *National Hockey League v. Metropolitan Hockey Club, Inc.,* 427 U.S. 639, 642–43, 96 S.Ct. 2778, 49 L.Ed.2d 747 (1976); *Adkins v. United States,* 816 F.2d 1580, 1581–82 (Fed.Cir. 1987).

The government first contends that Mr. Jay's submission of his supplemental report in March 2006 was improper under RCFC 26(a)(2)(c) because that submission occurred more than 30 days after Dr. Thakor submitted his amended report, or, in the alternative, on the ground that the submission violated the court's scheduling order reopening discovery. Def.'s Costs Mot. at 5–7; *see* Order of Nov. 21, 2005. In Mr. Jay's supplemental report, three distinct portions appear:

paragraphs 7–11 correct a figure in Model I, paragraphs 12–19 set out some observations responding to Dr. Thakor's amended report, and paragraphs 20–31 explain Revised Model I. PX 3386.

Respecting the first two portions of Mr. Jay's report, the court concluded that despite its tardiness, Mr. Jay was obligated to correct the inaccurate figure used in Model I pursuant to RCFC 26(e) and that he did so in the first portion of Revised Model I. In the second portion of the report, Mr. Jay produced commentary addressing Dr. Thakor's amended report that could just as easily be covered by testimony at trial. Neither aspect of the supplemental report warranted exclusion of the report, and, for similar reasons, the government's motion for costs should also be denied in these respects.

The government's alternative argument based on RCFC 26(a)(2)(C) rests on essentially the same rationale and is equally unavailing.

As to the third and final portion of Mr. Jay's Revised Model I, the court notes that Model I and Revised Model I are identical with respect to calculating damages from 1993 through American Federal's merger with CCB in 1997. *See* PX 3336, 3386. Thereafter, Revised Model I uses the same methodology as in Model I, but diverges insofar as it uses a different dividend stream. *Id.* All of the information on which Mr. Jay bases his calculations for this alternative dividend stream had been identified and addressed during discovery. The court determined that the government was not unduly prejudiced nor was the trial delayed in any respect as a result of Revised Model I. Thus, good cause was not shown for the exclusion from evidence of the third portion of Mr. Jay's supplemental report consisting of Revised Model I. *See* RCFC 37(c)(1).[52]

The government nonetheless seeks its costs in responding to this portion of Mr. Jay's supplemental report. In support, the government cites *Centex Corp. v. United States,* 71 Fed.Cl. 40 (2006), where plaintiff

---

52. The trial on damages was originally scheduled to commence on March 6, 2006, *see* Order of Dec. 14, 2004, and was thereafter postponed nearly one month for reasons wholly unrelated to the submission of Mr. Jay's supplemental report on March 21, 2006. *See* Order of Nov. 21, 2005.

was awarded costs after the government's expert submitted an untimely supplemental report that the court nonetheless admitted. *Id.* at 55–56. *Centex* is distinguishable from the present matter, however, because the supplemental report in that case, unlike Mr. Jay's Revised Model I, contained an entirely new methodology and new calculations. *Id.* at 47. Here, Mr. Jay did submit new calculations, but they reflected the same general methodology as that applied in Model I, and the manner in which the calculations differed from Mr. Jay's first damages model was not new to the case. Accordingly, the government's motion for costs with respect to the expert report Mr. Jay submitted on March 21, 2006 is denied.

The government also seeks costs from American Federal in reimbursement for the government's expenses in responding to Mr. Jay's rebuttal testimony. Def.'s Costs Mot. at 8–12. On direct examination, in plaintiff's case in rebuttal, Mr. Jay presented a third damages calculation, Model II, in which he used different figures and applied a different methodology. *See supra*, at 610–13. Plaintiff contends that in its case in rebuttal, it was forced to put forward new material to respond to two arguments that the government had allegedly "withheld ... until the middle of trial." Plaintiff's Response to Defendant's Motion for Costs ("Pl.'s Costs Response") at 5. This contention cannot be accepted. Both arguments plaintiff alleges were "new" were either based on facts that American Federal itself presented in discovery and through evidence adduced at trial, or were criticisms of Mr. Jay's damages models that the government's experts previously had disclosed during reopened discovery.

By the same token, Mr. Jay's rebuttal testimony and his calculations set out in Model II did not raise new factual issues. American Federal had presented the underlying facts for Mr. Jay's Model II during its case-in-chief largely through the testimony of Mr. Trimble. In particular, Mr. Jay incorporated Mr. Trimble's extensive testimony about the effects of the government's breach on the conversion of the Series A debentures

and the exercise of the MPCs, and the consequences for American Federal of the early conversion and exercise of these instruments. *See, e.g.,* Tr. 260:2–13, 432:24 to 433:4–19, 437:25 to 440:5 (Test. of Trimble). Even so, the fact remains that, while plaintiff had provided the factual predicates for Model II in its case-in-chief, Mr. Jay had not incorporated those predicates in his first two damages calculations. In fairness to both parties, the court first permitted Mr. Jay to provide a numerical exegesis through his rebuttal testimony of the facts American Federal had presented in its case, despite not having submitted an amended expert report, and second, allowed a temporary adjournment of the trial so as to permit the government sufficient time to analyze and rebut Mr. Jay's testimony. Tr. 2625:7–20, 2703:13–20, 2705:12–14.

The trial of this case would have proceeded more efficiently if plaintiff had initially presented a damages calculation in its case-in-chief reflecting all of the means through which it replaced regulatory capital with tangible capital, rather than relying only on documentary and testimonial evidence for certain of the steps that American Federal took in mitigation of the government's breach. Having permitted plaintiff to present such a damages calculation in belated fashion through Model II in its rebuttal case, requiring a short hiatus in the trial, the court concludes that it is appropriate for plaintiff to reimburse the government for the costs of having to respond to and analyze Mr. Jay's rebuttal testimony. The circumstance that the factual bases for that calculation were presented in plaintiff's case-in-chief supported admission of Mr. Jay's rebuttal testimony but does not excuse American Federal from the less-drastic sanction of reimbursing the government's costs. *See Centex*, 71 Fed. Cl. at 53–56 (imposing monetary sanctions on the government in lieu of evidentiary sanctions under RCFC 37(c)(1)); *Zoltek Corp. v. United States*, 71 Fed.Cl. 160, 171 (2006) (same) (citing *Central States Indus. Supply, Inc. v. McCullough*, 279 F.Supp.2d 1005, 1025–26 (N.D.Iowa 2003)).[53]

---

53. In analyzing the appropriateness of monetary sanctions, the court has discounted the circumstance that it has adopted a mode of computing damages for the cost of replacement capital that

Accordingly, the court awards the government its reasonable costs in responding to Mr. Jay's rebuttal testimony. The government has provided an enumeration of its costs in responding to Mr. Jay's rebuttal testimony, but those costs have proven to be difficult to separate from those that were attributable to the government's claim for costs associated with responding to Mr. Jay's supplemental expert report submitted on March 21, 2006. As a result, the court requests that the government resubmit its costs, separately stated to reflect only those that pertain to its response to Mr. Jay's rebuttal testimony.

### CONCLUSION

For the reasons stated, American Federal is awarded expectancy damages equal to the bank's net costs of replacement capital, with a tax gross-up, plus incidental losses of $3,610,081. American Federal shall provide a calculation of the costs of replacement capital, using the detailed methodology set out in the discussion *supra*, on or before September 28, 2006. The government shall respond with commentary and any proposed revisions to these calculations on or before October 16, 2006. American Federal may reply on or before October 24, 2006. A status conference will be held on September 12, 2006, commencing at 2:00 p.m., to address aspects of the calculation to be provided.

The government's motion for costs filed on July 7, 2006 is GRANTED in part and DENIED in part. American Federal is ordered to reimburse the government for its reasonable costs of responding to Mr. Jay's rebuttal testimony. The government shall provide its detailed enumeration of reimbursable costs on or before September 28, 2006, and American Federal may submit a response on or before October 12, 2006. The government's motion otherwise is denied.

It is so ORDERED.

differs in some respects from *any* of the models presented by Mr. Jay or that are implied by Dr.

Thakor's criticisms of Mr. Jay's models.